817 So.2d 741 (2002)
Labrant D. DENNIS, Appellant,
v.
STATE of Florida, Appellee.
No. SC95211.
Supreme Court of Florida.
January 31, 2002.
Rehearing Denied May 23, 2002.
*744 Bennett H. Brummer, Public Defender, and Louis Campbell and Christina A. Spaulding, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment and sentence of the trial court imposing a death sentence on Labrant D. Dennis. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the conviction and sentence of death.

FACTS
On the morning of April 13, 1996, University of Miami football player Earl Little arrived at his on-campus apartment to pick up the keys to his truck, a black Ford Explorer, he had loaned to his roommate and teammate, Marlin Barnes. Little loaned Barnes the truck the previous evening to attend a party at Club Salvation in Miami Beach and advised him that he would return to the apartment early the next morning to retrieve his vehicle. Little, who spent the night at another on-campus apartment, arrived at the apartment complex between 7 and 7:30 a.m. As he approached his third-floor apartment he noticed that his truck, which was parked outside the apartment, was tilting towards its right side. Little examined his truck and observed a puncture mark in his right rear tire. He then went upstairs to his apartment.
When Little attempted to open the door to his apartment he discovered that it was unlocked, but when he tried to push the door open he experienced resistance. Finally, after several attempts the door gave way enough for him to peer inside the apartment where he discovered Barnes' body lying against the front door. Little called Barnes' name and Barnes drew only *745 a heavy breath in response. Upon calling his name a second time, Barnes turned his head and Little saw for the first time that Barnes' face was badly beaten and bloodied. Little raced to a nearby apartment and called police.
Dan Oppert of the Coral Gables Police Department arrived on the scene at 7:34 a.m. Upon entering the apartment Oppert observed Barnes lying on the floor with his head leaning against the front door. As Oppert proceeded through the apartment to secure the premises he discovered the body of Timwanika Lumpkins in a bedroom. Lumpkins was lying face down and had severe trauma to the back of her head. As he continued his search of the apartment he observed that the back door was dead-bolted. When Oppert returned to the living room he watched Barnes make an attempt to get up and then collapse.
Wayne Sibley of the Coral Gables Fire Rescue arrived at the scene at 7:39 a.m. and Barnes was no longer breathing. Sibley and other emergency personnel quickly attended to Lumpkins who was still breathing. Barnes was pronounced dead at the scene and Lumpkins was pronounced dead after being airlifted to a nearby hospital.
When Miami-Dade Police officer Thomas Charles arrived at the scene, he first investigated the apartment's exterior. Charles examined Little's Explorer, observing that both tires on the right side had puncture marks. The only blood Charles noted on the exterior of the apartment was immediately outside the front door. Upon entering the apartment through the rear door, he observed no blood in the hallway meeting the rear door and no blood in one of the bedrooms. When he entered the bedroom in which Lumpkins' body was found, he observed a pool of blood in the middle of the room, with broken fingernails, strands of hair, and an earring belonging to Lumpkins.[1]
Charles next entered the living room where Barnes' body lay. Therein he found wooden splinters strewn about the floor which did not match any of the furniture found in the room. Additionally, he discovered a small metal fragment consistent with a shotgun trigger guard. Charles also observed a similar piece of metal along with bone fragments and teeth adjacent to Barnes' boot. Other items found near Barnes included a live 12-gauge shotgun shell, two gold colored bracelets and a football championship ring. The police surmised that robbery was not a motive for the crime as homicide detective Clarence Poitier also found $59 in Barnes' pocket, a gold chain with a medallion around his neck, $103 in Lumpkins' purse, and $550 in a bedroom dresser drawer.
That morning Edward Hudak, who served as liaison between the University of Miami and the Miami Police Department, organized a meeting of the football team on campus to break the news and uncover any leads. At that meeting some of the players indicated that Lumpkins had an ex-boyfriend who was a member of rap group by the name of "The Dawgs."
At 4 p.m. that afternoon, the lead detective at the crime scene, Thomas Romagni, was advised to head back to the station to interview members of "The Dawgs" who wanted to talk about the murders.
When Romagni arrived at the station, Lumpkins' ex-boyfriend, Labrant Dennis, was waiting with friend, Keith Bell. After Romagni advised Dennis that Lumpkins had been murdered, Dennis informed Romagni that he was romantically involved with Lumpkins for five years and that they had a child together.
*746 When asked about his relationship with Lumpkins, Dennis told Romagni that the two had arguments and that he might have slapped her on occasion. As to Barnes, Dennis indicated that he knew him and he believed that he lived on campus. Dennis, however, told Romagni that he had never been to Barnes' apartment.
Dennis told Romagni that he and Lumpkins had an argument the previous week after she came home late after an evening out with Barnes. Lumpkins was staying with Dennis at the house of his cousin, Carolyn Williams, and her boyfriend, Jesse Pitts. After the argument Lumpkins moved out on April 6. According to Dennis, Pitts informed him that the person who helped her move out was driving a black Explorer. Dennis believed that person to be Barnes.
As to his whereabouts the previous evening, Dennis told Romagni that he went to a bachelor party after 11 p.m., remaining there until 1:30 a.m. Dennis then went home, changed clothes, and went to the party at Club Salvation, leaving his cousin's house at 2 a.m. According to Dennis, his cousin Carolyn saw him when he came home after the bachelor party. Dennis denied seeing either Barnes or Lumpkins at the club. He remained at the club for about an hour and returned to his cousin's apartment and slept until the next morning.
Dennis consented to having his fingerprints taken and his car searched. Police also took pictures of him and observed no injuries on his body. Dennis then volunteered to have the clothes he wore the previous evening inspected, accompanying Romagni to his cousin's apartment for that purpose. Romagni examined the clothing and did not observe blood or other trace evidence. Thereafter, Romagni returned to the station with Dennis and Bell and told them that they were free to leave.
Several Miami-Dade detectives canvassed the Miami Beach area for information and encountered Nidia El-Djeije, an attendant at a Amoco gas station located within blocks of Club Salvation. El-Djeije told police that on the morning of April 13 at around 3 a.m. she observed a gray Nissan parked at the gas station. Between 3:30 and 4 a.m., El-Djeije became suspicious after observing a black man matching Dennis's general physical description, dressed entirely in black with a hooded sweatshirt covering his face, standing and walking around the car. El-Djeije called police. According to El-Djeije, the man walked towards her glass booth and turned towards Club Salvation. He returned no more than five minutes later, got in the car, and left before the police arrived. As soon as the police left, he returned and remained in the car. El-Djeije observed that the car had tinted windows and did not have a license plate. El-Djeije called Jose Rodriguez from Miami Beach Towing to advise the individual that the car would be towed if he did not leave. Rodriguez arrived at the gas station about fifteen to twenty minutes later, pulling up next to the driver's side of the Nissan. Rodriguez described the vehicle as a two-door light silver Nissan. The driver's side window was cracked open slightly and Rodriguez advised the person that he had to move the car. According to Rodriguez, the Nissan was pointed in the direction of a Chevron station across the street where a black Explorer with a flat tire or tires on its right side was being loaded onto a flat-bed truck. The driver of the Nissan drove off without responding to Rodriguez.
Detectives showed El-Djeije a picture of Dennis's car, a Mazda Protege, but she could not recognize it. Instead, El-Djeije definitively told police that the car she saw the previous evening was a Nissan. Several *747 days later detectives interviewed Watisha Wallace, Dennis's ex-girlfriend. Wallace owned a gray two-door Nissan Sentra which Dennis drove occasionally. On the weekend of the murders Wallace traveled to Daytona with several friends in a rental car, leaving her car behind. Wallace's car did not have a license plate displayed in the usual place. It was positioned in the rear window. The police took photographs of Wallace's car and showed them to El-Djeije. Upon seeing the photographs, Djeije identified Wallace's Nissan as the car she saw in the early morning hours of April 13.
After learning that Joseph Stewart, an acquaintance of Dennis, might have some information about the murders the police interviewed him on April 29. Stewart told police that on April 7, only a day after Lumpkins moved out, Dennis came to the apartment of Stewart's girlfriend, Zemoria Wilson. At that time, Dennis asked Stewart if he had any guns Dennis could borrow. Stewart told Dennis about an old sawed-off shotgun he had at his mother's house. The shotgun was missing the shoulder stock and had a long screw sticking out of that end of the gun. Otherwise the shotgun, which had a wood-type grill underneath the barrel, was intact. The two of them then rode in Dennis's car to Stewart's mother's house to retrieve the shotgun. Once there, Stewart advised Dennis that he was uncertain of whether the shotgun worked. Nonetheless, Dennis requested the shotgun. Stewart initially put the shotgun in a pillow case, but Dennis asked that he place it in something that would better conceal its appearance. Stewart then placed the shotgun in a blue duffel bag and Dennis asked him to carry it out to his car and place it in the trunk. According to Stewart, he did not give Dennis any ammunition, nor did he ask what Dennis wanted the shotgun for.
While Stewart was at work on the morning of April 13, he received a call from Dennis. Dennis told Stewart that he returned the shotgun and left it behind some bushes at his mother's house. When Stewart arrived home from work that afternoon he found the bag behind some bushes and immediately noticed that the duffel bag was much fuller than when he gave it to Dennis. Stewart took the bag inside his mother's house and upon opening it discovered a pair of black pants, a black sweatshirt, a pair of black boots, the shotgun, and a knife. The shotgun was considerably damaged: the trigger guard was missing, the handgrip was broken and pieces of the wood-like grill had been broken off. Stewart, who was familiar with guns, took the gun apart. When he unscrewed the ammunition chamber several shotgun shells fell out. Stewart became nervous and took the shotgun and the knife and threw them down a sewer drain. At the time, Stewart did not notice any blood on any of the items in the duffel bag. Stewart took the black clothing out of the duffel bag and kept both the clothing and the bag in his room.
The following morning Stewart received another call from Dennis. Dennis asked Stewart if he had found the duffel bag. Stewart told him that he had and asked Dennis if he wanted his clothes back. Dennis told Stewart the he could throw the clothes away. Stewart then threw the clothes and boots in a dumpster behind a grocery store. Later that Sunday Stewart paged Dennis, asking to meet with him. Dennis eventually came to Stewart's mother's house at which time Stewart advised him that he threw everything he left in the duffel bag away and that he wanted to be kept out of whatever was going on. Dennis responded, "Don't worry about it. Nobody would think to come here. I just had *748 to do what I had to do and I didn't even go in my car."[2]
During his interview with police, Stewart led them to the drain where he threw the shotgun and knife. The police were able to recover both items. The clothing, however, could not be recovered as the dumpster where Stewart had deposited Dennis's clothing had since been cleaned. Stewart also gave the police the blue duffel bag he retained.
Dennis was arrested on April 30, 1996, and charged with the murders of Marlin Barnes and Timwanika Lumpkins. He was subsequently indicted on May 8, 1996, on two counts of first-degree murder, one count of burglary with assault or battery while armed, and one count of criminal mischief (tire slashing).
At trial, Shabaka Abdul-Majid, a former teammate and friend of Barnes, testified that he and Barnes attended a party at Club Salvation on the night of April 12, 1996. Barnes drove Earl Little's Explorer to the party. According to Abdul-Majid, the two arrived at the club at midnight. About an hour after arriving, the two parted ways. The next time Abdul-Majid saw Barnes he was upstairs in the VIP section with Lumpkins. Barnes and Lumpkins were in an open area of the club which was visible from the first floor. Selma Wade, a friend of Barnes who was to meet Lumpkins at the party, testified that Barnes and Lumpkins could be seen from the first floor of the club hugging and kissing. At some point in the evening, Barnes exited to park the Explorer closer to the club. Abdul-Majid, Barnes, and Lumpkins eventually left the club at around 4:30 a.m. When they reached the Explorer they discovered that the tires had been slashed. They then pushed the Explorer to a nearby Chevron gas station. Majid and some other friends left Barnes and Lumpkins at the station while the two awaited a tow truck.
Tow truck driver Robin Lorenzo testified that he towed the Explorer back to the University of Miami campus while both Barnes and Lumpkins rode in the truck with him. Lorenzo dropped the two off at Barnes' apartment between 5:30 and 6:30 a.m.
To establish Dennis's motive, the State introduced evidence of prior incidents in which Dennis had stalked Lumpkins and one incident in which Dennis threatened to kill her with a gun.
In support of a finding of premeditation, the State presented the testimony of University of Miami basketball player Jennifer Jordan, a friend of Barnes and Dennis. Jordan testified that on several occasions in which Dennis drove her to campus, he asked her to "look out and see if I ever see Marlin with a girl that drove a red car." Lumpkins drove a red Honda Civic. On one of those occasions Dennis again asked Jordan to look out for a girl in a red car because "he believed Marlin was messing with his baby's mother." Only a month prior to the murders, Dennis visited Jordan on campus and asked her where Barnes lived and who lived with him. Jordan responded accordingly and Dennis explained that he wanted the information because he wanted to find out if Marlin was "f___ing around with his baby's mother."
*749 More damaging testimony was obtained from Bernadette Hardy. Hardy lived with Joseph Stewart's girlfriend, Zemoria Wilson, in April of 1996. Hardy, who knew Dennis, testified that sometime after 6 a.m. on the morning of the murders she was awakened by a knock at her window. When she looked out she saw Dennis outside wearing a black sweater. Dennis asked about Stewart's whereabouts and Hardy informed him that he was at his mother's house. Hardy's next-door neighbor, Deborah Scales, also testified that she was awakened that morning by banging on the window next door at around 7 a.m. Scales opened the door and observed a black male dressed entirely in black.[3]
As to the physical evidence recovered in the case the State produced the testimony of George Borghi, an expert in the area of trace evidence and fracture patterns. Borghi testified that the metal fragments recovered from Barnes' apartment conclusively matched the trigger guard of the recovered shotgun. To amplify Borghi's testimony, the State introduced several compelling photographs of the reconstructed trigger guard. Additionally, Thomas Quirk, an expert in tool marks, testified that the wooden fragments found at the apartment were consistent with the forearm of the shotgun. Quirk also testified that the knife obtained from the sewer drain was consistent with the puncture marks on the tires of the Explorer.
The shotgun was examined and while it tested positive for the presumptive presence of blood there was not enough blood to do more tests to confirm the presence of blood.[4] Further, the duffel bag Stewart loaned Dennis was tested and blood matching the victims' was found on the bag. No blood or any trace evidence of the defendant was identified at the scene, nor was any blood or trace evidence found in Wallace's Nissan.
The State also presented the testimony of Toby Wolson, a forensic biologist with an expertise in blood stain pattern analysis. Wolson's testimony explained the lack of any footprints from the assailant at the bloody crime scene. In particular, Wolson opined that the pooling and smearing of blood near the front door of the apartment and other nearby patterns were consistent with Barnes struggling and flailing about after the assailant had already exited the apartment. Moreover, Wolson testified that the pooling of blood in the bedroom where Lumpkins was found was consistent with the gradual bleeding from her wounds. Wolson further indicated that the traces of blood found immediately outside the front door of the apartment was likely the result of blood being pushed out from underneath the door as Barnes' wounds bled. Accordingly, Wolson opined that it was not unlikely that the assailant accumulated little blood from the scene despite the vast amount of blood present at the scene when the bodies were discovered.
As to the injuries suffered by the victims, the State's medical examiner testified that both victims died from massive head trauma. According to Dr. Gulino, Lumpkins suffered lacerations and a compound fracture to the back of her skull. Dr. Gulino opined that the skull fractures suffered by Lumpkins were the type typically seen in high-speed car accidents. Lumpkins also had a fracture to the base of her skull. Dr. Gulino indicated that many of *750 the injuries to the back of Lumpkins' head were consistent with being inflicted with the blunt portion of the shotgun. Moreover, several lacerations corresponded with the coils or spring of the ammunition tube of the shotgun. Lumpkins also had a fracture to her left hand and numerous other injuries to her hand which Dr. Gulino testified were consistent with an attempt to protect herself from injury.
Similarly brutal injuries were described by Dr. Gulino with regards to Barnes. Barnes suffered numerous lacerations over his face and head, many of which had a crescent character consistent with the broken trigger guard recovered at the scene. Indeed, the State introduced several composite pictures comparing the victims' wounds with the shotgun that made it readily apparent that the victims were struck with such force that their skin retained what amounted to the shotgun's "fingerprints." Barnes suffered numerous facial fractures. Like Lumpkins, Barnes had several defensive wounds to his forearms and hands.
In defense, Dennis presented the testimony of his cousin, Carolyn Williams, to substantiate his alibi defense. Williams testified that she saw Dennis in his bedroom with his daughter sometime after 2 a.m. She further testified that she next saw Dennis when she awoke at 5 a.m. According to Williams, he remained at the house for the rest of the morning.
The jury found Dennis guilty on all counts. At the penalty phase he offered the testimony of his mother and grandmother. They testified generally to his positive relationship with his family and loving relationship with his children. The defense offered no evidence of mental mitigation. Following the penalty phase, the jury recommended death sentences for both murders by a vote of eleven to one. The trial judge followed the jury's recommendation, finding four aggravating circumstances: (1) that the defendant had been convicted of a prior capital felony (the contemporaneous murder); (2) that the murder was committed in the course of a felony (burglary); (3) that the murder was especially heinous, atrocious, or cruel (HAC); and (4) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP). The court considered the following statutory and nonstatutory mitigation: (1) that the defendant did not have a significant history of prior criminal activity (not found and therefore given no weight); (2) that the defendant was under the influence of extreme mental or emotional disturbance (given little weight); (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (given no weight); (4) a catchall category of mitigationthe defendant's kindness to others and love and affection towards his family (given some weight); (5) that defendant's demeanor at trial was good (given some weight); (6) the length of sentence defendant could receive if not sentenced to death (found not to be mitigating and therefore given no weight); and (7) lingering or residual doubt as to defendant's guilt (found not to be mitigating and therefore given no weight).

APPEAL
On appeal Dennis raises thirteen claims of error. We address issues relative to the guilt phase first.
In his first claim Dennis contends that the trial court committed fundamental error in failing to provide the jury with a cautionary instruction on accomplices with regards to the testimony of Joseph Stewart.
*751 Florida Standard Jury Instruction (Criminal) 2.04(b) on the weighing of the testimony of an accomplice provides:
You should use great caution in relying on the testimony of a witness who claims to have helped the defendant commit a crime. This is particularly true when there is no evidence tending to agree with what the witness says about the defendant.
However, if the testimony of such a witness convinces you beyond a reasonable doubt of the defendant's guilt, or the other evidence in the case does so, then you should find the defendant guilty.
In Boykin v. State, 257 So.2d 251, 252 (Fla.1971), we rejected a similar claim of fundamental error. Boykin argued that the trial court committed fundamental error in failing to "give a cautionary charge that the uncorroborated testimony of defendant's accomplice ... should be received with `great caution.'" This Court rejected Boykin's claim, explaining that defense counsel's arguments, cross-examination of the accomplice, and the general charge regarding how the jury is to treat the testimony of witnesses covered the substance of the unrequested instruction on accomplices:
The content of the charge was in fact clearly referred to and covered by counsel in their presentations to the jury; furthermore, the general charge, with regard to how a jury is to treat the testimony of witnesses and give it such weight as they see fit under all of the evidence, substantially covers the question raised here. We do not recommend that such a charge in these circumstances not be given; we simply say that it was not fundamental error which would justify reversing the jury's verdict. It is discretionary.
The third factor that sufficiently covered the problem was the cross-examination of the accomplice which made it perfectly plain that he was a questionable and suspect witness. There can be little doubt that a jury of reasonable men and women clearly understands that the testimony of an accomplice is to be closely scrutinized and critically considered under these circumstances. There is nothing shown that would indicate to the contrary here.
Id. at 252 (footnote omitted); see also Archer v. State, 673 So.2d 17, 20 n. 3 (Fla.1996) (rejecting, without elaboration, appellant's claims that the trial court erred in failing to give several jury instructions including instruction 2.04(b)). This reasoning applies with equal force here. The defense's cross-examination of Stewart was dedicated to highlighting omissions in Stewart's early statements to police and his decision to hide the evidence out of fear of being considered a suspect. These facts were argued extensively by the defense in closing argument to urge the jury to disbelieve Stewart and to suggest that Stewart was the murderer and was merely attempting to lay the blame on Dennis. Accordingly, under the circumstances the general jury instruction on how to weigh the evidence was more than adequate to address Dennis's concerns.
In his next claim Dennis contends that the State improperly bolstered the credibility of several of its witnesses with inadmissible hearsay and opinions, along with the prosecutor's unsworn testimony.

Detective Romagni's testimony
The defense's cross-examination of lead detective Romagni was dedicated to demonstrating omissions in the investigation conducted by the police. Specifically, the defense focused on the failure of the police to pursue the person the defense argued should have been the prime suspect, *752 Joseph Stewart. The thrust of the defense's cross-examination was to demonstrate that the police essentially "chose" to believe Stewart:
Q. Okay. So for two weeks, after he tells you he knew that these homicides had occurred and he felt that what he disposed of was involved in a homicide, he still didn't call you to say, "Hey, I've got something that may be important here?"
A. He was afraid that he would have been charged.
Q. He was afraid he would be charged with this crime?
A. He was afraid he would be charged with a crime he had nothing to do with.
Q. When you say he had nothing to do with it, sir you choose to believe Joseph Stewart; correct?
A. I chooses [sic] to believe that your client duped Joseph Stewart.
. . . .
A. The reason he didn't tell mehe didn't tell me everything, and the reason he didn't tell me is because he didn't want to get that involved. He wanted to turn the evidence over, and he didn't want to get deeply involved.
Q. That's what you choose to believe?
A. That's what he told me.
Q. And you chose to believe him?
A. I have no reason not to believe him. I haven't seen anything to the contrary not to believe him.
On redirect the State responded to the defense's intimation that the police simply "chose" to believe Stewart's version of events by asking Romagni about the evidence the police had in their possession supporting there decision to arrest Dennis. The defense objected, arguing that the line of questioning called for inadmissible hearsay. The court overruled the defense's objection, based primarily on the State's representation that much of the evidence Romagni would refer to would be properly admitted through other witnesses. The following is a portion of Romagni's testimony on redirect:
Q. Did you speak to any witnesses as to the defendant's jealousy of Timwanika Lumpkins?
A. Yes.
Q. Did you speak to any witnesses as to the defendant spying on Timwanika Lumpkins and other persons?
A. Yes.
Q. Did you speak to any witnesses as to the defendant finding out where Marlin Barnes lived just months before his murder?
A. Yes.
Q. Did you speak to any witnesses about the fact that this defendant was spying on Timwanika and Marlin and their being together?
A. Yes.
Q. Did you speak to any witnesses that could tell you that the defendant knew at the time of the murders that Watisha's car was available that weekend and where it was left?
A. Yes.
Q. Did you speak to any witnesses that knew that around seven o'clock in the morning the defendant came dressed in black to Zemoria Wilson's apartment?
A. Yes.
Q. Asking for Joseph Stewart?
A. Yes.
Q. Did you speak to any witnesses that knew the defendant had possession of the murder weapon?
A. Yes.
Q. During the time of the murders?

*753 A. Yes.
The State argues that the defense's cross-examination of Romagni opened the door to this line of questioning. We agree.
In Rodriguez v. State, 753 So.2d 29 (Fla.2000), we explained the concept of "opening the door": "As an evidentiary principle, the concept of `opening the door' allows the admission of otherwise inadmissible testimony to `qualify, explain, or limit' testimony or evidence previously admitted. The concept of `opening the door' is `based on considerations of fairness and the truth-seeking function of a trial.'" Id. at 42 (citations omitted). Here the defense's cross-examination of Romagni opened the door to the State's line of questioning aimed at rebutting the defense's implication that the officers' investigation was less than thorough, relying solely on Stewart's word to arrest the defendant.
Even if we were to conclude that it was error to allow the State to pursue this line of questioning, any such error was harmless. Each and every point mentioned in Romagni's testimony on redirect was properly admitted into evidence through the testimony of other witnesses. See, e.g., Kearse v. State, 662 So.2d 677, 684-85 (Fla.1995) (finding no error in the admission of hearsay evidence concerning the sequence of events and why the police focused their investigation on the defendant where the same evidence was admitted through the testimony of other witnesses).
Dennis claims that Romagni's testimony was especially harmful to the extent it referred to Zemoria Wilson's purported corroboration of Stewart's testimony. During redirect Romagni testified as follows:
Q. When you interviewed Joseph Stewart, other than the cell phone records, what other witnesses did you interview that corroborated what Joseph Stewart said?
A. Zamoria Wilson, Bernadette Hard[y].
Although Dennis argues that this reference to Wilson, who did not testify at trial, was devastating because she was not subject to cross-examination, this isolated reference to Wilson was hardly the centerpiece of the State's case. Stewart's testimony was corroborated by, among other things, Dennis's cell phone records and the testimony of Bernadette Hardy and Deborah Scales. While we have cautioned against the admission of this kind of testimony under the guise of establishing the chronology of a police investigation, the instant reference to Wilson pales in comparison to testimony this Court has found worthy of reversal. Compare Keen v. State, 775 So.2d 263, 275-76 (Fla.2000) (finding reversible error in allowing detective to testify that insurance company investigation had concluded that, contrary to the defendant's claim, the defendant's wife did not die accidentally, but was murdered); and Wilding v. State, 674 So.2d 114, 119 (Fla.1996) (finding reversible error in the admission of a detective's testimony that the police began their investigation of the defendant after receiving an anonymous tip identifying the defendant as the perpetrator); with State v. Baird, 572 So.2d 904, 908 (Fla.1990) (finding error in the admission of a detective's testimony that the police targeted the defendant after receiving information that he was involved in the charged offenses harmless where the testimony was not featured by the State and there was independent evidence corroborating the testimony of coconspirators).
Dennis raises a similar claim as to the testimony of Detective Clarence Poitier. During cross-examination the defense challenged Poitier's testimony that the evidence *754 pointed to one, not multiple assailants. Eventually, defense counsel had the following exchange with Poitier:
Q. Certainly whether there was one assailant or more, you do not know whether they [the assailants] were surprised by Mr. Little trying to enter the apartment, do you, for a fact?
A. Based on the facts in evidence I've experienced in this case, it points to Dennis being there.
After further examination, defense counsel finally got Poitier to concede that he did not know for a fact there were not multiple assailants.
On redirect, the State attempted to ask Poitier what facts led him to the conclusion that Dennis committed the crime. The defense objected on hearsay grounds and the State argued that the defense opened the door to the inquiry. The court agreed with the State and the following transpired:
Q. Detective Poitier, what are the facts that you are aware of that leads you to [the] conclusion that the defendant is the person that committed these murders?
A. The fact that Joseph Stewart spoke to Detective Romagni.
Q. Anything else?
A. The domestic abuse history with the defendant and Ms. Lumpkins.
Q. Anything else, Detective?
A. Not that I could think of.
As with the testimony elicited from Detective Romagni, we hold that any error in the admission of this testimony was harmless as everything the detective referred to on redirect was testified in detail by other witnesses: Joseph Stewart testified extensively at trial and evidence of Dennis's abuse of Lumpkins was admitted through the testimony of Lumpkins' friend Chaka Kahn Williams and her uncle Patrick McKeithan. Indeed the State's redirect cured any impression that the police had information the jury was not privy to as Poitier mentioned evidence the jury eventually heard.
Lastly, although Dennis complains that Poitier's testimony amounted to an impermissible opinion as to guilt, he has not preserved that claim on appeal as he only objected on hearsay grounds at trial. See Jennings v. State, 782 So.2d 853, 862 (Fla. 2001) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.") (quoting Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982)). We do not find that Poitier's testimony reached the level of fundamental error.

Prosecutor's closing argument
In his final claim in his second issue on appeal Dennis contends that the State's closing argument was improper in that the prosecutor was allowed to present what amounted to unsworn testimony corroborating Stewart's testimony.
During the State's direct examination of Stewart, in an attempt to defuse the anticipated impeachment of Stewart by the defense, the State addressed his initial statements to police. Stewart initially told police that he was at his mother's house on the night of April 12, 1996. During that initial interview Stewart did not indicate that he had an alibi witness. In a later statement to police and the prosecutor, Stewart indicated that Dorothy Davis spent the night with him at his mother's house. Stewart testified that he omitted Davis's name in his initial statement because he did not want his girlfriend, Zemoria Wilson, who was in Chicago during that time, to find out that he was being unfaithful. In subsequent statements Stewart also indicated that *755 Dennis made several incriminating statements to him that he failed to mention during his initial interview.
As expected, the defense's cross-examination of Stewart focused on the omissions in Stewart's initial statements to police. The defense argued the issue further during closing argument:
You [Stewart] left something out. You left it out intentionally, isn't that true. Yes. So he didn't tell the detectives that he had an alibi witness and thenpardon me almost three months later when he['s] called down to the State Attorney's Office and finally thought on somebody.
. . . .
My client never confessed to him. That was manufactured by Joseph Stewart in order to get himself out of trouble.
The State responded to the defense's implication that Stewart essentially fabricated his story to "get himself out of trouble" in rebuttal argument:
Joseph Stewart told that statement to myself and another state attorney on July 2nd in the State Attorney's Office. The defendant had been in custody for these murders since April 30th, 1996, and he was still in custody on July 2nd and nobody had ever threatened. You heard the questions.
Nobody ever threatened Joseph Stewart for being arrested for anything so the argument that Joseph Stewart came up with his because he was scared of getting arrested is [absurd]. The defendant was arrested and into custody.
Joseph Stewart was out. Nobody ever said you are going to be arrested. Nobody ever said if you don't come up with some more evidence you are going to be arrested. Nobody said it looks bad for you Joseph.
As the defense offered no objection to the prosecutor's arguments, the arguments must constitute fundamental error for Dennis to be entitled to relief.
The State argues that the prosecutor's closing alluded to nothing the jury was not already aware of. We disagree. The import of Dennis's challenge to the State's closing argument was the prosecutor's "testimony" that no threats were made to Stewart during that interview to garner additional incriminating evidence against Dennis. Although the State's argument was improper, the record does not support a finding of fundamental error and the error was at best harmless. Detective Romagni's testimony made it clear to the jury that Stewart was never threatened with being arrested. Moreover, Stewart's statement to the prosecutor came well after Dennis was taken into custody on the strength of Stewart's initial statement to police. Accordingly, we reject Dennis's attempt to hold the prosecutor's argument fundamental error. Cf. Muhammad v. State, 782 So.2d 343 (Fla.2001) (prosecutor's closing argument referring to facts not in evidence regarding the police's receipt of information from a BOLO, which evidence was ruled inadmissible pre-trial, not fundamental error); Pope v. Wainwright, 496 So.2d 798 (Fla.1986) (holding prosecutor's reference in closing argument to having seen the defendant "grinning from ear to ear" during the testimony of a State witness was not fundamental error).
Dennis's third claim involves the State's attempt to impeach its own witness, Watisha Wallace, with evidence that she had her Nissan, the car the State argued Dennis used to commit the crime, burned for insurance fraud purposes. Dennis argues that the State called Wallace as a pretext for presenting, under the guise of impeachment, the evidence of the car *756 burning which would have otherwise been inadmissible.
The admissibility of this evidence was the subject of contentious pre-trial litigation. During pre-trial motions the defense argued that evidence of Wallace's burning of the car and conviction for insurance fraud was irrelevant and unfairly prejudicial. The State responded by arguing that the evidence was relevant to demonstrate Wallace's bias. At that time the State indicated that Wallace had the car burned four weeks after it was returned to her by police after it had been searched and no evidence had been discovered: "Four weeks. I think it goes to her bias, her motive. She sat in court on a daily basis when this case was being heard in motions, arguing because she wanted the car back."
Understandably puzzled by the State's argument that the evidence was relevant to the issue of bias, the trial court pressed the State for an explanation:
Court: What is her motive? I don't understand.
[State]: She is his girlfriend, and she's claiming he didn't use her car, and she wasn't in town, so how would she have known anyway? She's protecting him and lying for him, and it's very obvious because of some of the other witnesses who come in and testify. She sat in court and listened to the fact that her car was used during a homicide, and when she gets it back, a perfectly good car, she goes and has somebody steal it and pays somebody to burn it.
Although the State insisted that the evidence would not be used to suggest that Dennis had anything to do with the burning of the car, much of the State's argument on the issue indicated otherwise:
[State]: His ex-girlfriend or his girlfriend who visits him in jail, who claims that she has a baby by him while he's in jail, who he is supposedly supporting her children, she goes out and burns the car and tells the guy that burns it, "This car was used in the U.M. killings." That doesn't go to show her bias when she is trying to protect him and lie for him? That is the main crux of this case.
After initially reserving ruling on the defense's motion to exclude the evidence, at a subsequent hearing the trial court ruled that the State could question Wallace about the car burning. The court, however, advised the parties that it would issue a cautionary instruction to mitigate the danger of unfair prejudice. Although maintaining their objection, the defense agreed to a cautionary instruction and succeeded in having the trial court read the instruction each time the issue of the car burning was approached by a witness. The cautionary instruction provided:
The witness ... may allude in [his or] her testimony to certain facts regarding or relating to the burning and destruction of a certain automobile, which fact may constitute a crime.
That crime, if any, is not a charged crime in this case. Therefore, you shall not infer from said testimony any guilt or responsibility on the part of the defendant, Mr. Labrant Dennis, whatsoever for that act.
At trial, the State called Wallace in its case in chief and immediately impeached her with the fact that she and Dennis maintained a relationship and had a four-year-old child together. Wallace testified that she dated Dennis for five and a half years, but indicated that they were merely friends in April 1996. The State then impeached her with a bond application Wallace completed in October 1996 wherein she listed Dennis as her boyfriend. After Wallace continued to deny that she *757 maintained a romantic relationship with Dennis in April 1996, the State impeached her with the fact that when Dennis was arrested he was in her bed at 1 a.m. wearing only underwear.
Following this line of questioning, the State proceeded to ask Wallace about her car and Dennis's access to it. Wallace testified that Dennis drove her car on occasion. After Wallace testified that she had left her car on the weekend of April 12, 1996, at a friend's house while she and several friends drove to Daytona in a rental car, the following transpired:
[State]: Could the defendant have driven your car while you were away that weekend?
Wallace: No.
The State then went sidebar and indicated to the court that it wished to introduce the car burning incident. Puzzled, the court inquired of the State how Wallace's response prompted an inquiry into the matter. The State responded that Wallace's answer was completely contrary to the State's theory that Dennis used her car to commit the murders:
Court: What I don't understand [is] how did this particular question prompt this.
[State]: Because her answer was, No, he could not have driven the car. It's showing bias for the defense. How could she have possibly known.
Court: How was it impossible?
[State]: We are going to show mere bias. We are going to show she is lying. That's the theory that came in. She has complete bias for the defendant. She has given an incredible answer and we are showing that answer incredible and she has a bias to the defendant, which is evidenced by the fact.
That's the theory that comes in and we waited very carefully until we were sure the door was open to the testimony.
After extensive sidebar argument during which the defense argued that the State failed to lay a proper predicate for impeachment, Wallace was examined outside the presence of the jury. During the voir dire examination by the State, Wallace testified that she knew Dennis did not drive her car because she had her key with her in Daytona. Although she testified that he did not have her key and that she had not given him a spare set, she conceded that he could have made a spare key on one of the occasions he borrowed her car. Following Wallace's testimony, the State argued that the evidence was admissible to demonstrate her bias because the car burning incident demonstrated that there was at least one other key to the car in addition to Wallace's. The trial court, over the defense's continued objection, allowed the State to examine Wallace on the car burning incident based on the State's representation that they had a detective available to testify that they received another key to Wallace's car in the mail during their investigation of the insurance fraud case.
When the State continued its direct examination of Wallace, the prosecutor asked questions making it readily apparent that Wallace was aware of the importance of her car in the State's case before she had it burned. Thereafter the State asked Wallace about the incident and Wallace admitted being arrested and convicted for the burning of her car. Following that testimony the State introduced, over a defense objection as to relevancy, three pictures of Wallace's burned-out car. Those pictures were admitted into evidence.
On cross-examination, the defense emphasized that the car burning incident occurred *758 only after the police had seized the car to search for evidence and returned it. Wallace testified that she was arrested for the car burning incident five or six months after the police returned her car.
As promised, the State produced the testimony of Columbus Stafford, a retired City of Miami police officer who investigated the car burning incident in July 1996. Stafford identified registration papers indicating that Wallace was the owner of the vehicle in question and indicated, without discussing the substance of any statements, that he spoke to an anonymous person over the phone and subsequently received an anonymous letter along with the key of the vehicle. Stafford testified that he turned the letter and key over to an agent of the National Insurance Crime Bureau. That agent, Robert Dean Love, also testified at trial. Love testified that the car was found in June of 1996 and that he received the letter and key from Detective Stafford. Love further testified that he went to see the burned-out car and the key he was provided by Stafford opened the vehicle.
Section 90.608, Florida Statutes (1997), provides that "[a]ny party, including the party calling the witness, may attack the credibility of a witness by: ... (2) showing that the witness is biased." We review a trial court's ruling on the relevance of evidence under an abuse of discretion standard. See Zack v. State, 753 So.2d 9, 16 (Fla.2000). While a party is free to demonstrate the bias of a witness, the instant evidence was of dubious probative value in that regard and should have been excluded on account of unfair prejudice.[5]
The relevance of the car burning to demonstrate bias centered around the purpose the State ostensibly argued it was not offering the evidence for, i.e., that Wallace burned the car to destroy potential evidence. The State's direct examination was aimed in part at establishing that Wallace was aware of the importance of her car in the investigation and therefore burned it once the police returned it to her. Given the fact that the police had already searched the car before Wallace burned it, the evidence was of marginal probative value if any. Moreover, the State was able to demonstrate Wallace's bias by examining her regarding her relationship with Dennis. Accordingly, even assuming a cogent argument could be made that the evidence of the car burning was relevant to demonstrate Wallace's bias, the potential of unfair prejudice from the jury inferring that the car was burned to destroy evidence greatly outweighed any probative value the evidence possessed. The trial court implicitly recognized the danger of unfair prejudice presented by the evidence by insisting on a cautionary instruction.
Furthermore, the State's claim that the probative value of the evidence lay in its tendency to demonstrate that Wallace was lying when she testified that she had only one key to her car is similarly problematic. The evidence introduced to substantiate Wallace's conviction for insurance fraud did not demonstrate that Wallace had possession of another key or provided a spare key to another person to burn the vehicle, although the jury was undoubtedly invited to infer that fact from Detective Stafford's testimony that an anonymous individual sent the key and a letter to police which implicated Wallace. Moreover, Wallace's *759 testimony that she only had one key was not nearly as probative as the State suggested. In fact, Wallace conceded that Dennis may have made a copy of her key on one of the occasions he borrowed the car. Therefore, even assuming the relevance of the evidence to demonstrate bias, we conclude that the trial court abused its discretion in allowing the State to introduce evidence of Wallace's burning of her car given its marginal probative value and its tendency to suggest that Wallace burned the vehicle to destroy evidence incriminating Dennis. See Mansfield v. State, 758 So.2d 636, 648 (Fla.2000) ("We review a trial court's ruling on a section 90.403 objection on an abuse of discretion standard.").
Although error, we find the admission of this evidence to be harmless error. See, e.g., Rodriguez v. State, 753 So.2d 29 (Fla.2000) (applying harmless error analysis to the erroneous admission of evidence). The evidence of the car burning was not a feature of this lengthy trial, in which over forty witnesses took the stand. See, e.g., Consalvo v. State, 697 So.2d 805, 813-14 (Fla.1996) (holding prosecutor's closing argument, which highlighted the similarities between another burglary and the charged offense where the burglary was not admitted for that purpose, harmless error where the similarities between the crimes was not a feature of the trial). Further, the defense made the jury aware during its cross-examination of Wallace that she burned the vehicle only after it was seized and searched by police. Moreover, Detective Romagni testified during cross-examination that the search of Wallace's vehicle netted no evidence. The defense emphasized this point to the jury in closing argument:
The burning of that vehicle had absolutely nothing to do with this case. The police had that vehicle. They tested it in every way imaginable and they found nothing. So some act that she does that's illegal while he is in jail. He has never been charged with that and he has got nothing to do with it. That vehicle was burned merely for insurance fraud. It had nothing to do with this incident. The police already tested it. There was nothing there.
While the State referenced the car burning in its closing, it did so as part of its general attack on the credibility and perceived bias of Wallace, of which there was ample evidence absent the introduction of the car burning.[6] This coupled with the fact that the jury was given a cautionary instruction prior to each instance in which the subject was approached leads us to conclude that the error in the admission of this evidence was harmless.
In his next claim of error Dennis contends that the trial court erred in denying his motion to suppress Nidia El-Djeije's *760 identification of Wallace's car. Dennis argued that the identification was tainted as the product of an unduly suggestive identification procedure as El-Djeije was shown only a photograph of Wallace's car and not other similar Nissans.
At trial, El-Djeije testified that she worked as an attendant at a Miami Beach Amoco station near Club Salvation on the night of April 12, 1996, until 8:30 a.m. the following morning. That night, El-Djeije called police when she became suspicious of a black man dressed entirely in black wearing a hooded sweatshirt standing next to a Nissan parked at the station. In that call, the tape of which was introduced at trial, El-Djeije described the vehicle as a gray four-door 1986 or 1987 Nissan. Although not on the aforementioned tape, El-Djeije observed that the car did not have a license plate. Following the discovery of the bodies, Detective Juan Sanchez of the Miami-Dade Police Department met with El-Djeije at the gas station and showed her a photograph of Dennis's car, a Mazda Protege. El-Djeije told Sanchez that she did not recognize the Mazda and informed him that the car she saw was a Nissan. Several weeks later Sanchez returned to the gas station and showed her a picture of Wallace's Nissan Sentra. According to Sanchez, El-Djeije identified Wallace's car without hesitation.
Dennis argues that this procedure was unduly suggestive. We disagree. A two-pronged test is used to determine whether suppression of an out-of-court identification is warranted: "(1) did the police use an unnecessarily suggestive procedure to obtain the out-of-court identification; (2) and if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification." Thomas v. State, 748 So.2d 970, 981 (Fla.1999). The factors to be considered in the determination of whether the identification of the vehicle was reliable are all comparable to factors considered in a witness's identification of a suspect:
[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Pittman v. State, 646 So.2d 167, 171 (Fla. 1994) (quoting Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).
Although the State argues that there is no support to apply the aforementioned analysis to the identification of physical evidence, this Court in Pittman applied the aforementioned analysis to physical evidence.
In Pittman, the defendant claimed error in the court's admission of the out-of-court identification of the defendant's wrecker. Pittman was convicted of murdering three members of his estranged wife's family in their home and burning the home thereafter. On the morning of the fire a construction worker noticed a car belonging to one of the victims in a ditch near his job site and observed a homemade wrecker approach the car. Shortly thereafter he observed a cloud of smoke coming from the car's direction. Later that evening the police drove the witness to Pittman's home to observe Pittman's wrecker. The witness was unable to recognize the wrecker as it had been disassembled. After the police reassembled the wrecker, the police brought the witness back to Pittman's home and the witness positively identified the wrecker. Another witness, who had observed a homemade wrecker in the early morning hours following the murders, identified Pittman's wrecker weeks later *761 from a photo-pak that consisted solely of photographs of Pittman's wrecker.
In rejecting Pittman's claim we explained: "We have reviewed the record and find that, under the facts of this case, none of the identifications described above were unduly suggestive under the Neil[7] test. The first and second witnesses had a sufficient opportunity to view the wrecker and had given fairly accurate descriptions before the in-person identification." We conclude similarly here.
El-Djeije's initial description of Wallace's car was fairly accurate. She accurately described the color and make of the car. Moreover, she observed that the vehicle did not have a license plate in the place where one would be typically displayed. The discrepancies in El-Djeije's description were the proper subject of cross-examination, but not sufficient to amount to a bar to admissibility.
In his fifth claim of error Dennis argues that the trial court erred in allowing the State to impeach its own witness, Jessie Pitts. Pitts, who lived with Dennis in April of 1996, was called by the State and impeached with proof of a prior conviction for drug possession. The State also impeached Pitts with prior inconsistent statements. Dennis claims that the State called Pitts in bad faith for the sole purpose of impeaching him. The record does not support Dennis's claim.
In Morton v. State, 689 So.2d 259 (Fla. 1997), we discussed the ability of a party to impeach its own witness:
Obviously, no single rule can be delineated to cover all of the circumstances under which parties will seek to impeach their own witnesses. Generally, however, if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating. In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.
Id. at 264. Pitts had relevant testimony to give regarding his awareness of Dennis's whereabouts on the night of the crime as well as the fact that Lumpkins had left Dennis and moved out of the apartment only a week prior to the murders. Accordingly, we can discern no evidence of bad faith on behalf of the State in calling Pitts in its case in chief and, once called, he was subject to impeachment by the introduction of his prior inconsistent statements.
Dennis next argues that the trial court erred in admitting collateral evidence that he stalked, threatened, and assaulted Lumpkins. Dennis argues that this evidence was not relevant to demonstrate motive or intent and should have been excluded on grounds of unfair prejudice as it only demonstrated propensity.
The evidence Dennis complains of came from several of Lumpkins' family members and friends who recounted incidents in *762 which Dennis would stalk Lumpkins. Particularly, Lumpkins' uncle described one incident in which Dennis threatened to kill him and Lumpkins as he aimed a gun at both of them. In sum, the evidence depicted the turbulent and sometimes violent relationship between Dennis and Lumpkins.
With regard to the admissibility of prior crimes or bad acts, this Court has stated:
Evidence of "other crimes" is not limited to other crimes with similar facts. So-called similar fact crimes are merely a special application of the general rule that all relevant evidence is admissible unless specifically excluded by a rule of evidence. The requirement that similar fact crimes contain similar facts to the charged crime is based on the requirement to show relevancy. This does not bar the introduction of evidence of other crimes which are factually dissimilar to the charged crime if the evidence of other crimes is relevant.
Sexton v. State, 697 So.2d 833, 836-37 (Fla.1997) (quoting Bryan v. State, 533 So.2d 744, 746 (Fla.1988)); see also Pittman, 646 So.2d at 170 ("[E]vidence of bad acts or crimes is admissible without regard to whether it is similar fact evidence if it is relevant to establish a material issue."). Moreover, "[a] trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." Sexton, 697 So.2d at 837.
Although certainly prejudicial, the evidence of the nature of Dennis's relationship with the victim was relevant to establish Dennis's motive. See Burgal v. State, 740 So.2d 82, 83 (Fla. 3d DCA 1999) (holding prior incidents of domestic violence by the defendant against the victim were properly admitted to prove motive, intent, and premeditation in prosecution for attempted first-degree murder); Brown v. State, 611 So.2d 540, 542 (Fla. 3d DCA 1992) (holding that evidence that the defendant had a rocky relationship with the victim and had threatened to kill her if he caught her with another man was relevant to establish motive in a prosecution for battery and attempted second-degree murder).
Dennis next claims error in the State's introduction of evidence that he had a jealous character. Katina Lynn, Dennis's ex-girlfriend, testified concerning her relationship with Dennis. The defense, anticipating the State's line of questioning, objected and argued that any evidence of Dennis's jealous character was irrelevant. The trial court overruled the defense's objection, after which Lynn provided the following testimony:
[State]: Ms. Lynn you told us [that] at the beginning of your relationship with the defendant you didn't have any problems?
Lynn: No.
[State]: Did there come a time when you did begin having problems with the defendant?
Lynn: Like four to five months later.
[State]: And what was the basis of those problems?
Lynn: He was jealous that I was with Marlin [McGhee].
This was the extent of Lynn's testimony regarding Dennis's jealousy. The admission of this evidence was clearly improper.
Section 90.404, Florida Statutes (1997), as to the admissibility of character evidence provides:
(1) CHARACTER EVIDENCE GENERALLY.Evidence of a person's character or a trait of character is inadmissible to prove action in conformity with it on a particular occasion, except:

*763 (a) Character of accused.Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the trait.
See also Flanagan v. State, 625 So.2d 827, 829 (Fla.1993) ("Establishing that a defendant has a certain character trait in order to show he acted in conformity with that trait on a certain occasion is forbidden by the rules of evidence."). The admission of this evidence was aimed solely at establishing propensity.
Nevertheless, the erroneous admission of this evidence was harmless. As demonstrated by the above-quoted portion of Lynn's testimony, her testimony as to Dennis's jealous character was extremely limited. Moreover, the jury properly heard substantial evidence of incidents in which Dennis's jealousy manifested itself in his relationship with Lumpkins.
In his eighth claim on appeal, Dennis contends that the trial court erred in admitting several autopsy photos of the victims over his section 90.403 objection. We disagree. We have repeatedly emphasized that the "test for admissibility of photographic evidence is relevance, not necessity." Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). Moreover, we review a trial court's ruling on the admissibility of photographic evidence under an abuse of discretion standard. Id.
The photographs complained of by Dennis were relevant to demonstrate the extent of the brutal injuries suffered by the victims, which were not visible in other unobjected-to photographs. Accordingly, we hold that the trial court did not abuse its discretion in admitting the autopsy photographs.
We now turn to Dennis's claims relative to the penalty phase.
Dennis first claims that the trial court's sentencing order provides an inadequate basis for review in that it contains several factual inaccuracies. Specifically, Dennis claims that the court erred in rejecting the no significant history of prior criminal activity mitigator and relied on several facts not in evidence in applying the HAC aggravator.
In examining the duty of the sentencing court in evaluating mitigating circumstances offered by a defendant, this Court has stated:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature.... The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance.
Foster v. State, 778 So.2d 906, 919-20 (Fla. 2000) (quoting Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990)). Despite Dennis's arguments to the contrary, the trial court's sentencing order reveals a thorough consideration of the aggravating and mitigating circumstances at issue.
In support of its rejection of the mitigating circumstance of no significant history of prior criminal activity, the trial court made the following findings:
(A) Family members testified regarding long periods of arguments and anger in the relationship. That during these arguments the Defendant would physically abuse Ms. Lumpkins.
(B) That family members observed on more than one occasion the physical marks of abuse on Ms. Lumpkins.

*764 (C) That Ms. Lumpkins related these incidents of physical abuse of her by the Defendant to different family members.
(D) That' at times after these periods of physical abuse there would be a separation but the couple would almost invariably reunite. However, that during these periods Ms. Lumpkins feared the Defendant.
(E) That an uncle of Ms. Lumpkins testified that the Defendant was obsessive and possessive in his relationship with Ms. Lumpkins that he would react violently at times towards her.
Although some of the aforementioned findings are not supported by the record or are inaccurate, none of these discrepancies are substantial.
As to the trial court's finding that family members testified that during arguments Dennis would physically abuse Lumpkins, none of the witnesses produced at trial or during the penalty phase provided such testimony. While the trial court's finding that "family members" observed the physical marks of abuse on Lumpkins caused by the defendant was inaccurate, there was other testimony that Lumpkins suffered injuries at the hands of the defendant. For example, Lumpkins' best friend Chaka Kahn Williams testified that she observed a black eye on Lumpkins that was inflicted by Dennis. Detective Thomas Romagni also testified that during an interview Dennis responded that he slapped Lumpkins on occasion when Romagni asked whether Dennis and Lumpkins used violence against one another during their relationship. Moreover, the jury heard evidence that Dennis threatened to kill Lumpkins with a gun.
In addition to this evidence, during the penalty phase, the State produced the testimony of Lumpkins' uncle Patrick McKeithan, who testified that during one occasion in which Dennis was arguing with Lumpkins, Dennis struck him with a gun. According to McKeithan, a police report was filed, but Dennis was never arrested and charges were never filed. Additionally, Katina Lynn testified as to several incidents in which Dennis became jealous and physically abused her. According to Lynn, there were several occasions in which Dennis threatened to kill her with a gun, grabbed her by the neck, and banged her head against a wall. As with the other incidents, Dennis was never arrested nor were criminal charges filed. The State, however, is not limited to convictions when rebutting this mitigator. See Lucas v. State, 568 So.2d 18, 22 n. 6 (Fla.1990) ("Arrests and other evidence of criminal activity, without convictions, may be `significant' and may rebut this mitigator."); Walton v. State, 547 So.2d 622, 625 (Fla. 1989) ("Once a defendant claims that this mitigating circumstance is applicable, the state may rebut this claim with direct evidence of criminal activity."). In sum, notwithstanding the factual inaccuracies in the sentencing order, there was ample evidence supporting the lower court's rejection of this mitigating circumstance.
Similarly, the trial court's findings supporting its application of the HAC aggravator contained some factual inaccuracies regarding the nature of the victims' injuries. These inaccuracies, however, were not essential to the trial court's findings. The evidence was uncontroverted that both victims suffered horrible injuries. Any inaccuracies in the finer details of the injuries endured by the victims were inconsequential to the HAC finding. Cf. Sims v. State, 681 So.2d 1112, 1118 (Fla. 1996) (holding discrepancy between mitigating circumstance considered by court in its sentencing order and that on which the jury was instructed inconsequential where the sentencing order made clear "that the *765 judge properly addressed and rejected both mitigating circumstances.").
We next turn to Dennis's claim of error with regard to the trial court's finding of the CCP aggravator. Dennis essentially argues that all of the evidence in the case pointed to a "rage" killing, not a planned murder. The trial court made the following findings in support of the CCP aggravator:
Upon learning that his longtime girlfriend, Timwanika Lumpkins, the mother of his child, had moved out of the location where they lived with the help of Marlin Barnes, the Defendant began a thoughtful, purposeful, deliberate and inevitable plan to murder the victims herein.
The Defendant obtained the murder weapon, to-wit; a non-working shotgun which along with other malfunctions had no stock on it and no spring inside by which it could properly be loaded. He obtained this weapon in spite of the fact that he owned a working handgun during this same period. He borrowed this weapon from one Joseph Stewart who was not even a close friend but who had found the weapon abandoned and had possessed it for a long period of time. The Defendant returned the shotgun to its owner immediately after the deed was done. The only inference that can be drawn from this series of facts regarding the murder weapon is simply to that the Defendant took pains to obtain and use a weapon that could not be traced to him.
The Defendant used a vehicle the night of the murder which was identified as a vehicle owned by the Defendant's present girlfriend. This vehicle while having a license tag, said tag was not located in the place where tags are usually displayed. This particular tag was displayed on the upper left side of the rear window. A location where a tag is much harder to see.
The vehicle occupied by the Defendant was seen the night immediately preceding the morning of the murders on Miami Beach near a night club where the victims had gone to that evening to attend a party. The Defendant was clearly following and/or stalking the victims.
One of the tires of the vehicle used by the victims that evening was punctured and the tire rendered flat disabling the vehicle. The puncture mark left in the tire of the vehicle was consistent with having been made by a tool later shown to have been possessed by the Defendant. This disabling of the car delayed the victims from arriving at the apartment. A tow truck had to be ordered to tow the vehicle and transport the victims from Miami Beach to Coral Gables. This took additional time. This enabled the Defendant to arrive at the apartment ahead of the victims and wait for the victims' arrival.
The evidence established beyond a reasonable doubt the Defendant knew where Marlin's apartment was located on the University of Miami Campus because he had inquired and obtained that information from a former girlfriend who knew.
The trial court's findings are amply supported by the record.
To prove the existence of the CCP aggravator, "the State must show a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill." Gore v. State, 784 So.2d 418, 432 (Fla.2001) (quoting Bell v. State, 699 So.2d 674, 677 (Fla.1997)). Moreover, "a trial court's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling *766 is supported by competent substantial evidence in the record." Gore, 784 So.2d at 432.
There is substantial evidence in the record supporting the trial court's finding of the CCP aggravator. In addition to the record evidence recited in the trial court's sentencing order, Stewart testified that Dennis told him, "Don't worry about it. Nobody would think to come here. I just had to do what I had to do and I didn't even go in my car." Accordingly, we find no merit to Dennis's argument. See, e.g., Zakrzewski v. State, 717 So.2d 488, 492 (Fla.1998) (affirming the trial court's finding of CCP where the defendant purchased the murder weapon the morning prior to the murders and lay in wait at home for the arrival of the victimshis wife and two children); Cummings-El v. State, 684 So.2d 729, 731 (Fla.1996) (finding the CCP aggravator where defendant threatened to kill his ex-girlfriend with a gun several weeks before the murder, told the victim that if "he could not have her no one could" shortly before the murder, and armed himself with a knife, and waited outside the victim's home until after she arrived and went to sleep before committing the murder); Porter v. State, 564 So.2d 1060, 1063-64 (Fla.1990) (affirming CCP finding where the defendant previously threatened to kill his former lover, staked out the victim's house two days before the crimes, and stole the murder weapon).
Dennis also claims error in the trial court's finding of the HAC aggravator. Dennis argues that the evidence supports a finding that the murders took only a matter of minutes and that the victims were struck with such force that they were likely rendered unconscious well before their deaths. This argument is wholly without merit.
We have explained that the HAC aggravator applies "only in torturous murders-those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Rose v. State, 787 So.2d 786, 801 (Fla.2001) (quoting Guzman v. State, 721 So.2d 1155, 1159 (Fla. 1998)).
Both victims in this case suffered horrid injuries. The medical examiner, Dr. Gulino, testified that both victims suffered skull fractures as a result of the brutal beating they endured. Moreover, the evidence supports the trial court's finding that the victims were conscious for at least part of the attack as they had defensive wounds to their hands and forearms. Further, the State's blood stain pattern expert, Toby Wolson, testified that the bloodiness of the crime scene and the patterns of the blood stains strewn about the apartment supported the conclusion that Barnes got to his feet and struggled about the room after Dennis had already left. Accordingly, we find no error in the trial court's application of the HAC aggravator.
In his penultimate claim, Dennis contends that the trial court erred in according little or no weight to the extreme mental or emotional disturbance mitigator. The trial court rejected this mitigator largely on its finding of CCP. Dennis argues that this was error because the record does not support the application of the CCP aggravator. As we have already rejected Dennis's claim that the CCP aggravator is unwarranted in the instant case, we find the instant claim without merit.
Lastly, Dennis argues that the death sentence is not proportionate as this was a crime of heated passion. Dennis's proportionality argument appears premised on the notion that this Court has created a "domestic dispute" exception to *767 the imposition of the death penalty. However, we have cautioned that our proportionality review does not embrace such an exception:
[T]his Court has never approved a "domestic dispute" exception to the imposition of the death penalty. In some murders that result from domestic disputes, we have determined that CCP was erroneously found because the heated passions involved were antithetical to "cold" deliberation. However, we have only reversed the death penalty if the striking of the CCP aggravator results in the death sentence being disproportionate.
Way v. State, 760 So.2d 903, 921 (Fla.2000) (citations omitted).
Moreover, as illustrated by the trial court's findings in support of the CCP aggravator, the record refutes Dennis's claim that these murders were committed in the heat of a domestic dispute. Accordingly, given the substantial aggravation in the instant case and the absence of any significant mitigation, we find the death sentence proportional. See Way, 760 So.2d at 921 (finding death sentence proportional in double murder where the defendant bludgeoned his wife and daughter with a hammer and where the trial court found the prior violent felony (contemporaneous murder), felony murder (arson), and HAC aggravators balanced against no substantial mental mitigation);[8]Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (finding death penalty proportionate where the circumstances "depict[ed] a cold-blooded, premeditated double murder").
Lastly, although not raised by Dennis, we have independently reviewed the evidence and find it sufficient to support the convictions.

CONCLUSION
Accordingly, we affirm the convictions and sentences of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects, with the exception, however, of its harmless error analysis concerning the erroneous admission and use of evidence that the defendant's girlfriend had her car burned and destroyed after it was returned to her by the police. The facts of this case are, of course, horrendous, and, because this appears to be an otherwise error-free trial, this case simply represents another instance where hard cases sometimes make bad law. The State had a strong case, but simply reached too far in attempting to prove the defendant's guilt of murder by his girlfriend's act of arson.
As noted in the majority opinion, the State contended at trial that the burning of the car and the girlfriend's hearsay statement that the car was used in the murders, "is the main crux of this case." Simple logic should tell us that improper evidence that the State relies upon as "the main crux of the case" could hardly be characterized as harmless. The majority opinion itself makes this clear when it correctly concludes that "the potential of unfair prejudice from the jury inferring that the car was burned to destroy evidence greatly outweighed any probative value the evidence possessed" as potential *768 impeachment of the girlfriend's collateral testimony about the keys to the car.
Tellingly, the majority opinion wholly omits any discussion of our landmark opinion on harmless error in State v. DiGuilio, 491 So.2d 1129 (Fla.1986), wherein we held that the State has the burden of demonstrating beyond a reasonable doubt that there is no reasonable possibility that the jury relied on the improper evidence in its deliberations and verdict. To be sure, it would be patently unreasonable to conclude that the jury would not consider evidence "that is the crux of the case" in its deliberations. Indeed, it appears that the State viewed the burning car as the proverbial "smoking gun" to clinch the case. It would be naive to think that the jury would not similarly rely on this devastating evidence of the girlfriend's belief that her boyfriend was guilty of this heinous offense and that her car was used in the crime.
PARIENTE, J., concurs.
NOTES
[1] The other earring was found under the bed Lumpkins' body lay next to.
[2] At trial, the State introduced Dennis's cellular phone records. Those records corroborated Stewart's recall of the times and places where Dennis phoned him following the murders. Moreover, the State introduced Stewart's time card from work which indicated, consistent with his testimony, that he clocked into work on the morning of April 13, 1996, at 6:32 a.m.
[3] Although Scales testified that she could not recognize the individual, she was certain that it was not Joseph Stewart.
[4] The expert testified that this was not surprising given that the shotgun was submerged in the sewer drain for some time before it was recovered.
[5] Section 90.403, Florida Statutes (1997), provides in relevant part:

Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
[6] The following is the extent of the State's discussion of Wallace's burning of her car in its closing argument:

He had a key to her car and she saw the key. Watisha said "no" he helped pay for my car, but he didn't have a key. Watisha who says that the car was in the same exact spot and Watisha who a few weeks after getting the car back from the police went out and burned it.
The car used in this homicide she burned it and she pled guilty to burning it. ...
By the way going back to Watisha. She said that she and the defendant were just friends and yet she told you that when he was arrested he was undressed, in his underwear, in her bed.
What is she trying to hide here. Columbus Stafford told you he was investigating the arson of the car and somebody anonymous sent the factory key in the mail. Bob Love, the detective with the insurance commission told you that it was a factory key. It fit the car and two of them usually comes [sic] with the car.
[7] Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
[8] The trial court in Way also found the CCP aggravator but did not rely on that finding in support of its imposition of the death sentence. See Way, 760 So.2d at 920.