758 So.2d 636 (2000)
Scott MANSFIELD, Appellant,
v.
STATE of Florida, Appellee.
No. SC92412.
Supreme Court of Florida.
March 30, 2000.
*640 James B. Gibson, Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Scott Mansfield. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction and death sentence.
On the morning of October 15, 1995, the body of Sara Robles was found lying in a grassy area next to a Winn-Dixie grocery store in Kissimmee, Florida. Robles was lying on her back with her legs and arms outstretched. Her shirt and skirt were pushed up partially revealing her breasts and pelvic area which were multilated.
Examination revealed that Robles' nipples had been excised, as well as portions of her labia minor, majora and clitoris.
The police recovered from the scene a Winn-Dixie bag with a receipt inside, and another receipt reflecting the purchase of some groceries which were found scattered near Robles' body.[1] Robles was found wearing a watch, apparently broken during the murder, which was cracked and stalled at 3 a.m. Additionally, among the items recovered strewn around her body were food stamps and a pager.
The ensuing investigation revealed that the receipts found near Robles' body reflected purchases made roughly at 2:35 and 2:36 a.m.[2] The police then questioned Jesus Alfonso, a friend of Robles, who visited with Robles the previous evening. Alfonso told police that he and Robles went to Rosie's Pub, located in the same shopping plaza as the Winn-Dixie. Alfonso left the bar at 1:30 a.m., but Robles remained at the bar playing pool with a male whose description matched Mansfield's.
Karen Hill, a bartender at Rosie's Pub, was then interviewed and indicated that Robles was at the bar the previous evening in the company of Mansfield. According to Hill, Mansfield, Robles, and a third individual by the name of William Finneran exited the bar together shortly after 2 a.m.
After speaking with other witnesses confirming that Robles was in the company of Mansfield and Finneran during the early morning hours of October 15, the police questioned Finneran who indicated that he had exited the bar with Mansfield and Robles shortly after 2 a.m. and that he last saw them around 3 a.m. at Winn-Dixie.
The police, after learning that the pager found at the murder scene was traced to Mansfield, focused their investigation on him. Additionally, the police interviewed Juanita Roberson, a Winn-Dixie night clerk, who indicated that Robles purchased the items reflected in the recovered receipts with a man whose description matched Mansfield's and that Robles was in the company of that same man outside the Winn-Dixie when Roberson took her break at approximately 3 a.m. the night of the murder. With this information in hand, three detectives went to Mansfield's *641 residence the night following the murder to question him. Mansfield agreed to be interviewed by the detectives at the police station.
Prior to being transported to the station, the detectives noticed that Mansfield had fresh scratches on his knees and hands. Once at the station, he avoided and inconsistently answered many of the questions posed to him during the roughly two-and-a-half hour videotaped session. Specifically, Mansfield admitted to being at Rosie's Pub with Robles, but initially insisted that he had gone directly home after leaving the bar. Following further questioning, he begrudgingly admitted going to Winn-Dixie after leaving Rosie's Pub.
Shortly before the interrogation ended, the police received further evidence placing Mansfield at the scene of the crime. Juanita Roberson, the Winn-Dixie night clerk, identified Mansfield in a photograph lineup at the police station as the man she saw with Robles outside the Winn-Dixie the previous evening at approximately 3 a.m. The detectives directed Mansfield to lift his shirt at which time they observed a bruise on his chest. The police then arrested Mansfield and took into evidence a ring he was wearing with a distinctive "grim reaper" design.
The following day, Mansfield's brother, Charles, called the police and asked them to come down to his apartment to gather some items found in Mansfield's room. Once there, the police recovered food stamps, a knife and sheath, clothing, and a towel.[3]
While at the apartment the police also questioned Mansfield's 10-year-old niece, Melissa Mansfield, who told them that Mansfield arrived home on the morning of October 15 at about 4:30. Melissa told police that Mansfield came to the door soaking wet, wearing shorts but no shirt, and carrying his shoes. Melissa told police she gave Mansfield a towel at his request, and that she noticed what appeared to be a small blood stain on his shorts.[4]
The State introduced several other witnesses at trial who placed Mansfield with Robles at or near the crime scene at approximately the time the murder was presumed to have occurred. The State's medical examiner, Dr. Julie Martin, testified as to the existence of a pattern injury on the neck of Robles consistent with the pattern found on the "grim reaper" ring removed from Mansfield following his arrest.
Dr. Martin testified that Robles died of asphyxia due to airway compression as a result of blunt force trauma to the neck. Specifically, Dr. Martin opined that the murderer, while straddling Robles, strangled her with one hand, using the other hand or an object (the ring) to press down on her lower neck, causing her trachea to collapse. She further testified as to the existence of extensive bruising about Robles' eye, neck and collarbone. Dr. Martin concluded that Robles was conscious and struggling to breathe for "more than a few minutes" before becoming unconscious. According to Dr. Martin, Robles was alive but most likely unconscious when parts of her genitalia were excised by a sharp object consistent with the knife recovered from Mansfield's room.
The State also introduced the testimony of convicted felon Michael Derrick Johns who recounted a jailhouse conversation *642 with Mansfield in which Mansfield confessed to Robles' murder. The defense did not present any evidence.
The jury, after being instructed on both first-degree premeditated murder and first-degree felony murder, found Mansfield guilty of first-degree murder. The jury unanimously recommended the death penalty. The trial court followed the recommendation and sentenced Mansfield to death.
In support of the death sentence, the trial judge found two aggravating circumstances: (1) the crime was especially heinous, atrocious, or cruel; and (2) the crime was committed during the commission of or an attempt to commit a sexual battery. The court found no statutory mitigation and five nonstatutory mitigators and found the following three mitigators were entitled to very little weight: (1) the defendant's good conduct during trial; (2) the defendant is an alcoholic; and (3) the defendant's mother was an alcoholic during his childhood. The court accorded the remaining two mitigators some weight: (1) the defendant had a poor upbringing and dysfunctional family; and (2) the defendant suffers from a brain injury due to head trauma and alcoholism.

In-effective Assistance of Counsel
On appeal, Mansfield challenges both his conviction and sentence of death, raising ten issues.[5] In his first issue, he alleges that his trial counsel was ineffective in failing to accurately communicate a plea offer made by the State following the entry of the guilty verdict.
After Mansfield was found guilty of first-degree murder, and at some point during the penalty phase proceedings, the State made a plea offer requiring him to plead guilty to first-degree murder and waive his appellate rights in exchange for the State's waiver of the death penalty. The record reveals that there was some initial confusion regarding the terms of the offer. Ultimately the State placed the offer on the record. Thereafter, Mansfield's counsel expressed uneasiness over the terms of the offer based upon their belief that the plea offer called for the performance of a legal impossibility; i.e., entering a post-verdict guilty plea. The State then withdrew the offer.
A claim of ineffective assistance of counsel is generally not cognizable on direct appeal. See Kelley v. State, 486 So.2d 578, 585 (Fla.1986). An exception to this general rule is recognized where the claimed ineffectiveness is apparent on the face of the record. See Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987); Stewart v. State, 420 So.2d 862, 864 (Fla. 1982). We are not presented with such an instance here. Accordingly, we do not reach the merits of Mansfield's ineffectiveness claim as it is more properly raised in a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.

Suppression of the Statements
Mansfield next claims error in the denial of his motion to suppress his statements to the detectives on October 15, 1995. First, Mansfield argues that the trial court's order denying his motion to suppress was deficient because it contained no factual findings. Second, he argues that the statements should have been suppressed *643 because the detectives failed to warn Mansfield of his rights prior to the interrogation. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
We reject the claim premised upon the lack of factual findings in the trial court's order denying the suppression motion. It was Mansfield's counsel who proposed the one-sentence order entered by the court and stood silent when the State objected to its brevity. The defense, having invited the error, is precluded from complaining of it on appeal. See Pope v. State, 441 So.2d 1073, 1076 (Fla.1983).
Accordingly, this Court must review the record to determine if the trial court's denial was supported by the evidence. The question of whether a suspect is in custody is a mixed question of law and fact. See Ramirez v. State, 739 So.2d 568, 574 (Fla.1999), cert. denied, ___ U.S. ___, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000).
The testimony adduced at the suppression hearing established that at least three or four plain-clothes officers went to Mansfield's apartment at approximately 9:30 p.m. the night following the murder. Once there, the officers asked Mansfield if he would accompany them to the police station to discuss the investigation of a crime.[6] Mansfield contends that he requested an attorney from one of the officers before being taken to the station; however, the officers involved testified to the contrary and Mansfield himself was unclear as to which officer he allegedly directed his request.
The detectives then transported Mansfield to the police station for questioning. Mansfield argues that he was in custody at this time, given the ample evidence the police had gathered, prior to the interrogation, tying him to the victim and the murder scene as well as the unlikeliness of his being allowed to leave. It is clear, however, that to the extent the evidence incriminating Mansfield and the officers' subjective beliefs concerning his culpability were unarticulated, they are of little assistance in the "custody" determination. See Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Once the interrogation began, however, the police confronted Mansfield with evidence connecting him to the victim and the murder scene, making it abundantly clear that he was their prime suspect.
Once at the station, Mansfield was interrogated by a total of three officers, with no more than two being present in the interrogation room at once. Shortly after the police began the interrogation, they questioned Mansfield concerning the whereabouts of his pager, which the police had found at the scene that morning and traced to Mansfield earlier in the day. Mansfield acknowledged having lost his pager the previous evening and indicated that he might have left it at Rosie's Pub, after which the following exchange took place:
Detective Shepard: No, I'm going to tell you you didn't lose it [the pager] at the bar because you know where we found it. Okay? With her [Ms. Robles].
Mansfield: With her?
Shepard: Yeah, with her.
Mansfield: I don't think so. She wouldn't steal my pager.
Detective Schroeder: No, no, no, no, no. She didn't steal your pager.
Shepard: She didn't steal your pager. It got pulled off during the struggle. She didn't steal the pager. Okay? I mean you can go on all day like this but, you know, are you somebody that needs help or are you like a sicko? You know *644 what I'm saying? I mean did this just happen. You get out of control, you had a little to drink and she said something, you got out of control?
As the interrogation progressed the detectives flatly asked Mansfield to convince them he was not Robles' killer:
Detective Lakey: I'm trying to bring it back in your mind. Like I said, there's a time when you need to help yourself a little. Okay? I'm bringing it back in your mind. I'm jogging your memory. Okay? That's what I'm doing. I'm jogging your memory. I'm not saying that you intentionally killed this girl. Only you know this.
Mansfield: I didn't kill anybody.
Lakey: How do you know you didn't? We keep getting back to this.
Mansfield: I know I didn't ...
Lakey: Convince me.
Mansfield: I don't kill people.
Lakey: Convince me.
Mansfield: How can I convince you? You see[m] convinced that I already did....
Lakey: Scott, you and I both know something happened. What happened?
Mansfield: Nothing. Nothing happened.
Lakey: Convince me you didn't kill her. Tell me what happened.
Shortly thereafter, one of the detectives made it clear that Mansfield was not free to leave: "You and I are going to talk. We're not going to leave here until we get to the bottom of this. I'm going to help you. That's what I'm going to do. I'm going to help you. I'm going to help you remember and we're going to get this thing cleared."
It is undisputed that Mansfield was not advised of his rights at any point prior to or during the interrogation. The State, however, maintains that Miranda warnings were not required because Mansfield was free to leave during the interrogation.
When determining if a defendant is in custody for purposes of Miranda the ultimate inquiry is whether "a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest." Ramirez v. State, 739 So.2d at 573.
In Ramirez we formally acknowledged that the determination of whether a reasonable person in the suspect's position would consider himself in custody is guided by the consideration of four factors:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Id. at 574; see also Caso v. State, 524 So.2d 422, 424 (Fla.1988); Roman v. State, 475 So.2d 1228, 1231 (Fla.1985); Drake v. State, 441 So.2d 1079, 1081 (Fla.1983). Consideration of these factors in the instant case leads inevitably to the conclusion that Mansfield was in custody for purposes of Miranda: Mansfield was interrogated by three detectives at the police station, he was never told he was free to leave, he was confronted with evidence strongly suggesting his guilt, and he was asked questions that made it readily apparent that the detectives considered him the prime, if not the only, suspect.
We therefore find that Mansfield was in custody for purposes of Miranda, and accordingly the tape of his interrogation should have been suppressed. This moves us to a harmless error analysis. "The erroneous admission of statements obtained in violation of Miranda rights is subject to harmless error analysis." Caso v. State, 524 So.2d 422, 425 (Fla.1988). Error is harmless if the reviewing court can say beyond a reasonable doubt that the error did not affect the verdict. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). Such is the character *645 of the error that occurred in the instant case.
In Alvord v. Dugger, 541 So.2d 598, 601 (Fla.1989), we found the erroneous admission of the custodial statements harmless error where the statements were not the centerpiece of the State's case. Specifically, in Alvord, the defendant's girlfriend testified to a conversation with the defendant in which the defendant confessed to the crime. The State also presented evidence demonstrating that the defendant harbored a dislike for the victim and had some of the victim's jewelry in his possession after the murder, and that some physical evidence matched that found at the murder scene. The evidence presented in the instant case is similar and arguably stronger. In the instant case the State, in addition to the significant circumstantial evidence placing the defendant at the crime scene with the victim near the time the murder is presumed to have occurred, presented the testimony of Michael Johns, who recounted a jailhouse confession by Mansfield. Additionally, the testimony tended to show that the food stamps found in Mansfield's room the day after the murder belonged to Robles. Further, the State's medical examiner testified as to the existence of a pattern injury on Robles' neck matching the distinctive pattern found on the ring recovered from Mansfield during his arrest.

Heinous, Atrocious, or Cruel
Mansfield next argues that the trial court erred in finding the heinous, atrocious, or cruel aggravator. First, Mansfield argues that the medical examiner could not state to a degree of medical certainty exactly how long it took for the victim to lose consciousness. Without such proof, Mansfield maintains, the heinous, atrocious, or cruel aggravator cannot be established. This argument is without merit.
In reviewing a trial court's determination of heinous, atrocious, or cruel, this Court examines the record to ensure that the finding is supported by substantial competent evidence. See Hildwin v. State, 727 So.2d 193, 196 (Fla.1998), cert. denied, ___ U.S. ___, 120 S.Ct. 139, 145 L.Ed.2d 119 (1999). The evidence in the instant case meets this standard.
The State's medical examiner, Dr. Martin, testified that Robles was conscious during the strangulation and beating, and suffered pain therefrom in a desperate struggle to breathe for at least a few minutes. While the medical examiner could not pinpoint for exactly how long the victim experienced pain, her testimony made clear that Robles was conscious for "more than a few minutes."[7] We have affirmed a trial court's finding of heinous, atrocious, or cruel under similar circumstances. See Cole v. State, 701 So.2d 845, 852 (Fla.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1370, 140 L.Ed.2d 519 (1998); Hildwin, 727 So.2d at 196; Tompkins v. State, 502 So.2d 415, 421 (Fla.1986); Robertson v. State, 699 So.2d 1343, 1347 (Fla.1997), cert. denied, 522 U.S. 1136, 118 S.Ct. 1097, 140 L.Ed.2d 152 (1998).
As his second point, Mansfield argues that evidence that Robles' blood alcohol level was over the legal limit indicates that she was probably not conscious during the attack.[8] Dr. Martin, however, testified that Robles was conscious despite the alcohol in her system: "She was under the influence of alcohol as far asI think it shows that she was alert enough to struggle and try to fight off what was happening *646 to her. As far as the degree in spite of the fact a .14, yes, it does have some calming effect, but evidently she was awake and alert enough to struggle." Further, Dr. Martin testified that Robles had defensive wounds, further supporting the conclusion that she was conscious and struggling for her life.
Moreover, this Court has rejected similar arguments against a heinous, atrocious, or cruel finding based on the purported unconsciousness of the victim because of the victim's blood alcohol level. See Guzman v. State, 721 So.2d 1155, 1160 (Fla. 1998) (rejecting the unconsciousness argument where the victim's blood alcohol level was .34, citing, Whitton v. State, 649 So.2d 861 (Fla.1994)), cert. denied, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995).
We therefore conclude that the trial court was correct in applying the heinous, atrocious, or cruel aggravator to the present case.

Proportionality
As his fourth claim, Mansfield claims the imposition of the death sentence in the instant case is disproportionate. Before undertaking a review of this claim, it is necessary to address Mansfield's fifth claim of error concerning the trial court's finding that several proposed nonstatutory mitigators were not established by the evidence, the court's rejection of the "no prior violent felony" mitigator, and the court's decision to accord the voluntary intoxication mitigator little weight.
A trial court "must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." Campbell v. State, 571 So.2d 415, 419 (Fla.1990) (footnote omitted). A trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent substantial evidence to support the rejection. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). After reviewing the record, we find competent substantial evidence to support the court's finding that the proposed mitigators of service in the military and completion of a substance abuse and mental health program were not established by the evidence. Nor do we find error in the court's rejection of the lack of a violent felony record as a valid mitigating circumstance.
Mansfield also alleges error in the trial court's decision to accord the voluntary intoxication mitigator little weight. The weight to be assigned to a mitigating factor lies within the discretion of the trial court. See Campbell, 571 So.2d at 420. "[T]o be sustained, the trial court's final decision in the weighing process must be supported by `sufficient competent evidence in the record.'" Id.
The evidence did establish that Mansfield consumed alcohol on the night of the murder. However, in its sentencing order, the trial court found that there was no evidence indicating that Mansfield's use of alcohol rendered him unable to realize the import of his actions. Instead the court found that the evidence established that he was keenly aware of his actions:
Based upon the testimony, it is quite clear that the defendant has had a long history of alcohol abuse dating back many years. It is also clear that the defendant was drinking the night of this crime. But there is no evidence to show that at the time of the commission of this horrible crime that he did not know what he was doing or that alcohol has affected him in any way. The statements by the defendant to Michael Johns about what he did to the victim shows that he was keenly aware of what he was doing.
The trial court's decision in this regard is consistent with this Court's decision in Raleigh v. State, 705 So.2d 1324, 1330 (Fla. 1997), cert. denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998), where we found no abuse of discretion in the trial court's decision to assign little weight to the proposed voluntary intoxication mitigator *647 based largely on evidence of the defendant's competence and purposefulness in carrying out the charged crime. Accordingly, we find that the trial court did not abuse its discretion in deciding to accord the voluntary intoxication mitigator little weight.
Turning to proportionality, Mansfield argues the present case is not the most aggravated and is far from unmitigated. This Court's proportionality review focuses on the totality of the circumstances in a case and compares it with other capital cases to ensure uniformity in application. See Terry v. State, 668 So.2d 954, 965 (Fla.1996). After reviewing the circumstances in the instant case we find the death penalty proportionate when compared to other cases in which we have found death the appropriate penalty. See Davis v. State, 703 So.2d 1055, 1061-62, (Fla.1997), cert. denied, 524 U.S. 930, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998) (affirming the imposition of death where the trial court found, as in this case, the two aggravating factors of heinous, atrocious, or cruel and committed during the course of a sexual battery outweighed slight nonstatutory mitigation); Hauser v. State, 701 So.2d 329 (Fla.1997) (death sentence proportionate where the victim was strangled and the trial court found the three aggravators of heinous, atrocious, or cruel, cold, calculated, and premeditated, and pecuniary gain balanced against one statutory mitigator and four nonstatutory mitigators).

Discovery
Mansfield next alleges error in the trial court's determination that the State did not violate the rules of discovery by failing to formally list photographic slides in its discovery. The State developed scaled photographs from the slides which were then used by the medical examiner at trial to illustrate the similarity between the pattern of the grim reaper ring recovered from Mansfield and the pattern injury on Robles' neck. Specifically, during her testimony the medical examiner compared the pattern on Mansfield's ring by placing the ring on the scaled photographs in front of the jury. This argument fails.
During the Richardson hearing,[9] it was established that the scaled photographs were developed from slides that were part of the medical examiner's business records. Further, the slides had been made available to Mansfield's original counsel during depositions and original counsel actually went through the slides. Additionally, the defense admitted that they were aware of the photographs at least one week prior to the Richardson hearing. Moreover, during pretrial motions held roughly two weeks prior to the Richardson hearing, Dr. Martin testified as to the similarity between Mansfield's ring and pattern injury on Robles' neck.
Accordingly it appears that Mansfield, while not formally on notice as conceded by the State, was on notice of the use of photographs and as to the substance of Dr. Martin's testimony therefrom. On this record, we find the trial court did not abuse its discretion in ruling that the State did not violate the rules of discovery.

Knife and Sheath
Mansfield next claims error in the introduction of the knife and sheath into evidence over his relevancy and unfair prejudice objections.[10]
Mansfield maintains that the knife and sheath were not sufficiently linked to him to have any evidentiary value and that *648 the State failed to adequately demonstrate that the knife was used in Robles' murder. He argues that the introduction of the knife and sheath served only to confuse the jury. These claims are unfounded.
The evidence established that Mansfield's brother, Charles, called police to recover items from Mansfield's room only one day after the murder. Among the items recovered by police were the knife and sheath. The knife was found in the closet of Mansfield's room and the sheath was in a nightstand drawer along with the food stamps thought to have been taken from Robles.[11]
Moreover, the medical examiner testified that the incised wounds on Roble's genitalia were consistent with being caused by the knife recovered from Mansfield's room. Most importantly, the medical examiner testified that injuries on Robles' eye and forearm were consistent with a pattern at the base of the knife blade containing multiple square-like raised edges. We have previously indicated that this kind of testimony is sufficient to establish the admissibility of an alleged murder weapon. See Ramirez v. State, 542 So.2d 352, 355 (Fla.1989). In Ramirez this Court, in rejecting expert testimony from a tool mark expert that a specific knife was the murder weapon in that case, indicated that the knife in question could have been admitted based on testimony from the medical examiner that the victim's wounds were consistent with being caused by the knife in question: "The knife itself, however, could have been properly admitted as relevant evidence because it was an instrument which could have caused the victim's wounds, based on the medical examiner's testimony and the other evidence linking this knife to Ramirez."
We review a trial court's ruling on a section 90.403 objection on an abuse of discretion standard. See State v. McClain, 525 So.2d 420, 422 (Fla.1988). In making its determination the trial court must weigh the danger of unfair prejudice against the probative value, and in doing so proper considerations include "the need for the evidence; the tendency of the evidence to suggest an improper basis to the jury for resolving the matter, e.g., an emotional basis; the chain of inference necessary to establish the material fact; and the effectiveness of a limiting instruction." Id. (quoting Charles W. Ehrhardt, Florida Evidence, § 403.1, at 100-03 (2d ed.1984)).
On the record before this Court, we conclude that the trial court did not abuse its discretion in admitting the knife and sheath into evidence.

Photographs
Mansfield next challenges the admission of photographs depicting the mutilation of the victim's genitalia and an autopsy photograph of the victim's brain, arguing that they were unnecessary.
The test for the admissibility of photographic evidence is relevance, not necessity. See Gudinas v. State, 693 So.2d 953, 963 (Fla.1997). A trial court's ruling on the admission of photographic evidence will not be disturbed absent a clear showing of an abuse of discretion. Id. The photographs in question were relevant to the medical examiner's determination as to the manner of the victim's death, and were probative in the determination of the heinous, atrocious, or cruel and sexual battery aggravators. Accordingly, we find that the trial court did not abuse its discretion in admitting these photographs.

Remaining Claims
In his two remaining claims, Mansfield claims that the trial court erred in allowing victim impact evidence and in rejecting his special requested jury instruction on the heinous, atrocious, or cruel aggravator.
*649 First, Mansfield's claim of error as to the admission of victim impact testimony and two photographs of the victim is without merit. Roble's mother-in-law, Mirza Valladares, testified as to the effect Robles' death had on her surviving children. Mansfield claims that such testimony does not speak to the uniqueness of the victim, and accordingly, is not appropriate victim impact evidence. We have previously approved this kind of victim impact evidence in Windom v. State, 656 So.2d 432 (Fla.1995), and Bonifay v. State, 680 So.2d 413 (Fla.1996). This Court in Bonifay stated:
Clearly, the boundaries of relevance under the statute include evidence concerning the impact to family members. Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family.
Id. at 419-20. Nor do we find error in the admission of the two photographs of the victim, one of her pictured with her family and the other of her and her children engaged in church activities. See Alston v. State, 723 So.2d 148, 160 (Fla.1998); Branch v. State, 685 So.2d 1250, 1253 (Fla. 1996).
Finally, before trial Mansfield moved to declare section 921.141(5)(h) Florida Statutes (1995), unconstitutional and proposed a jury instruction on the heinous, atrocious, or cruel aggravator, emphasizing that the victim must have consciously suffered pain for the aggravator to apply. We have previously addressed and affirmed the constitutionality of the objected-to heinous, atrocious, or cruel instruction. See Chandler v. State, 702 So.2d 186, 201 (Fla.1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998); James v. State, 695 So.2d 1229, 1235 (Fla. 1997). We see no reason to retreat from that position.
Moreover, Mansfield's claim of error as to the trial court's rejection of his proposed instruction essentially reargues his claim as to the sufficiency of the evidence supporting the heinous, atrocious, or cruel aggravator. As noted previously, the evidence clearly established that Robles was conscious during the attack for at least several minutes.
Finally, although not challenged by Mansfield, we have independently reviewed the evidence and find it sufficient to support the first-degree murder conviction. See Jennings v. State, 718 So.2d 144, 154 (Fla.1998), cert. denied, ___ U.S. ___, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999).
Accordingly, for the reasons expressed, we affirm the conviction and sentence of death.
It is so ordered.
HARDING, C.J., and SHAW, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, J., concurs as to the sentence and concurs in result only as to the conviction.
ANSTEAD, J., concurs as to the conviction and concurs in result only as to the sentence.
NOTES
[1] Juanita Roberson, a Winn-Dixie night-clerk working the early morning hours of October 15, testified that Robles, accompanied by Mansfield, made the purchases reflected in the receipts recovered by the police at the scene.
[2] The receipts found at the crime scene indicated that the documented purchases were made at 1:35 and 1:36 a.m. However, when the police took the receipts to the Winn-Dixie and had the assistant manager run some receipts to check the accuracy of the time reflected therein it was discovered that the registers were approximately an hour behind.
[3] During its case in chief, the State's senior crime lab analyst, David Baer, testified as to the results of DNA and blood testing done on the items recovered from Mansfield's room. His testimony established that some of the items had blood that was consistent with Mansfield's. The tests conducted on the items recovered from Mansfield's room, however, did not reveal the presence of Robles' blood.
[4] During Mansfield's interrogation with police the previous evening, Mansfield told police that he had taken a swim in the pool in the early morning hours of October 15 before entering the apartment and that his niece saw him enter the apartment afterwards.
[5] The ten claims raised in this appeal are: (1) Mansfield's counsel was ineffective in failing to accurately communicate the State's plea offer after Mansfield was found guilty at trial; (2) the court erred in denying the motion to suppress statements made by Mansfield to the detectives prior to his arrest; (3) the court erred in finding the heinous, atrocious, or cruel aggravator; (4) the death sentence is not proportionate; (5) the court erred in its consideration of mitigating factors; (6) the court erred in finding no discovery violation for the State's failure to list demonstrative evidence introduced at trial; (7) the court erred in admitting the knife and sheath into evidence; (8) the court erred in admitting photographs of the victim's body; (9) the court erred in permitting victim impact evidence; and (10) the court erred in rejecting Mansfield's special requested jury instruction on the heinous, atrocious, or cruel aggravator.
[6] One of the officers, Warren Shepard, testified in pertinent part:

We told [Mansfield]We identified ourselves, told him we were with the Kissimmee police department, and that we were investigating a crime. That his name came up, and we would appreciate him coming down to the police station so we could discuss it.
[7] The State's medical examiner testified in pertinent part:

I can tell you it wasn't a couple of seconds and I don't think it was a couple of minutes. I think it was longer than that. From what I previously said as far as the lungs being twice as heavy, the fact the brain had time to swell, the extensive injuries of the face and neck, this did go on for a while. I can't tell you exactly how long, just that it wasn't quick. It was more than a few minutes.
[8] Dr. Martin testified that Robles had a blood alcohol level of .14.
[9] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[10] Section 90.401, Florida Statutes (1999), provides: "Relevant evidence is evidence tending to prove or disprove a material fact." Section 90.403, Florida Statutes (1999), provides in pertinent part: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."
[11] The evidence at trial established that Robles was receiving food stamps at the time of her death. Additionally, testimony at trial indicated that Mansfield neither previously nor presently received food stamps, and neither did anyone living with Mansfield.