843 So.2d 856 (2003)
Roger Stewart HARRIS, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1598.
Supreme Court of Florida.
March 27, 2003.
*859 James E. Taylor, Jr., Orlando, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court finding Roger Stewart Harris guilty of first-degree murder and imposing the death penalty. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Harris's conviction but vacate his sentence of death and remand for a new penalty phase proceeding.

FACTS AND PROCEDURAL HISTORY
On Monday, December 7, 1998, the body of Donna Harris was discovered in her van which had been parked in a truck stop parking lot for several days. An autopsy revealed the cause of death to be a wound to the back of the head. Roger Harris *860 (Harris), the victim's husband, had reported her missing on Friday, December 4, 1998. Harris quickly became a suspect in his wife's murder, and on January 22, 1999, was indicted for first-degree murder and conspiracy to commit first-degree murder.
The evidence presented at trial revealed the following facts: In late June 1998, Jennifer Palmer moved in with Roger and Donna Harris to care for the Harrises' two children. On July 3, 1998, Donna moved out of the house with the children apparently because Harris and Palmer had developed a sexual relationship. After the July 4 weekend, Donna returned home and ordered Palmer to leave. Palmer moved in with the Harrises' neighbors but continued to care for the Harris children for a little over a month. During this time, Harris and Palmer continued their sexual relationship. When Donna discovered that Harris and Palmer had continued their sexual relationship, Palmer was fired. At this point, Harris told Palmer he was going to leave his wife, and Harris and Palmer agreed to be married.
In mid-October, Harris told Palmer he decided not to divorce Donna because she had threatened to take their children to Kentucky so that he would never see them again. However, Harris and Palmer resumed their relationship after one week and continued to discuss marriage. In order to marry Palmer without divorcing Donna and risk losing his children, Harris told Palmer that he planned to kill Donna.
On December 2, 1998, Harris and Palmer discussed killing Donna. Palmer worked her shift at a local bar and after work called the Harris home two or three times but no one answered. Harris later called the bar and told Palmer, "I did it. I am washing my hands and I need you here." Palmer went to Harris's home and observed him cleaning some items for about fifteen minutes and disposing of several items into a black garbage bag. Harris placed the black garbage bag into Palmer's car and told her to throw it away. Harris also gave Palmer a white bag and instructed her to throw its contents into the water. Harris told Palmer the white bag contained a gun he made by welding pieces together. Palmer then left the Harris house in her car and pursuant to Harris's instructions, waited for him to pass her at the end of the road. Harris was driving his wife's van.
Palmer followed Harris to a truck stop, but she parked and waited at a nearby gas station. Palmer then moved her car to a nearby restaurant, and ten to fifteen minutes later Harris walked up to Palmer's car. As they drove towards Harris's home, Harris undressed and instructed Palmer to throw away his clothes. Harris told Palmer he was going to call the police the next day and report Donna missing. After dropping Harris off at home, Palmer dumped the items given to her by Harris at various locations in Columbia County. Palmer was arrested on December 7, 1998, and indicted for accessory after the fact to first-degree murder and conspiracy to commit first-degree murder. Palmer pled guilty to both charges and pursuant to the plea agreed to testify truthfully concerning her knowledge of Donna Harris's death.
On April 27, 2000, a jury found Harris guilty as charged. After penalty proceedings, the jury returned a recommendation of death by a vote of seven to five. Following the Spencer[1] hearing on June 9, 2000, the trial court sentenced Harris to death on June 23, 2000, finding two aggravating circumstances,[2] and considering *861 three statutory mitigators[3] and sixteen nonstatutory mitigators.[4]
Harris raises nine issues on appeal: (1) whether the trial court erred in allowing the State to introduce prior consistent statements; (2) whether the trial court erred in allowing the State's firearm expert to display a plastic replica of the murder weapon; (3) whether the trial court erred in admitting inflammatory photographs; (4) whether the trial court erred in finding the murder was committed for pecuniary gain; (5) whether the trial court erred in finding the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification; (6) whether the imposition of the death penalty in this case is proportionate; (7) whether the jury was misled as to the significance of its verdict; (8) whether Harris's death sentence is constitutional in light of the jury's seven-to-five vote; and (9) whether Florida's death penalty statute violates the Florida and federal constitutions.

GUILT PHASE

Admission of Prior Consistent Statements
First, Harris argues the trial court erred in admitting Palmer's prior consistent statements through the testimony of her friend, Shannon Harding. Harding testified over defense objection to statements Palmer made about her relationship with Harris and the plan to kill Harris's wife. On the issue of prior consistent statements, we recently said:
It is well established that prior consistent statements are generally not admissible to bolster a witness's testimony at trial. See Chandler v. State, 702 So.2d 186, 197 (Fla.1997). In order to be admissible, prior consistent statements, like any other hearsay statements, must qualify under a hearsay exception. See id. Otherwise, prior consistent statements can be admitted as nonhearsay "if the following conditions are met: the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that *862 statement; and the statement is offered to `rebut an express or implied charge... of improper influence, motive, or recent fabrication.'" Id. at 197-98; see also § 90.801(2)(b), Fla. Stat. (1995).
Bradley v. State, 787 So.2d 732, 743 (Fla.), cert. denied, 534 U.S. 1048, 122 S.Ct. 632, 151 L.Ed.2d 552 (2001). Thus prior consistent statements can be admitted as nonhearsay if two conditions are met. First, the person who made the prior consistent statement must testify at trial and be subject to cross-examination concerning the statement. This condition was met in this case because Palmer testified at trial and was subject to cross-examination. Second, and the point of disagreement between Harris and the State is that the statement must be offered to rebut an express or implied charge of improper influence, motive, or recent fabrication. The State argues that because Palmer admitted on cross-examination she was motivated to testify against Harris because she desired a favorable sentence, defense counsel "opened the door" to her prior consistent statements. We agree with the State.
During cross-examination, defense counsel questioned Palmer about the circumstances surrounding her trial testimony, asking, "And you understand or feel that you might could help your cause by helping the state prosecute Roger, do you not," to which Palmer responded, "Yes, sir." Defense counsel also asked, "Is it not true that you feel like in your mind the better job you do testifying, the better deal you will get when it comes time to be sentenced, when the number of years is determined," to which Palmer responded, "Yes, sir." Defense counsel's line of questioning was an attempt to show that Palmer was motivated to testify against Harris because she desired to obtain a favorable sentence from the State, and thus was sufficient to create an inference of improper motive to fabricate. See Foster v. State, 778 So.2d 906, 916 (Fla.2000); Rodriguez v. State, 609 So.2d 493, 500 (Fla.1992).
Harris claims, however, that Palmer was angry with Harris for failing to leave his wife, and because this motive existed before the statements were made to Harding, Palmer's prior consistent statements are inadmissible.
Palmer admitted on cross-examination that she felt sad and upset when Harris stated he was not leaving his wife. However, on direct examination Palmer testified Harris decided not to divorce his wife because he was afraid of losing his children, not because he no longer wished to marry Palmer. There is no indication in the record that Harris attempted a reconciliation with his wife or that Palmer believed Harris was ending their relationship to be with his wife. Harris and Palmer's plan was to kill Donna so that Harris could keep his children and marry Palmer. Therefore, we find no merit to Harris's argument that Palmer's motive to testify falsely existed before the statements were made to Harding.
Because Palmer's statements were made to Harding before Palmer's arrest, and therefore prior to the existence of a motive to fabricate, they were properly admitted. See, e.g., Anderson v. State, 574 So.2d 87, 92-93 (Fla.1991) (finding prior consistent statement admissible when defendant attempted to impeach witness by suggesting she fabricated her testimony after negotiating a favorable plea, because prior consistent statement was made before the plea agreement).

Admission of Plastic Replica of Murder Weapon
Next, Harris argues the trial court erred in allowing the State's firearm expert to display a plastic replica of the murder weapon. David Williams, an expert in firearms *863 and tool mark identification, identified the following evidence: a six-inch piece of pipe with threads on both ends, a copper fitting, a piece of copper tubing with what appeared to be a cartridge casing inside, a spring, what appeared to be a primer, a bolt with a finishing nail punch, a pair of vice-grip pliers, a number of .357 magnum cartridges (illustrative of all other cartridges received), another piece of pipe, a brass connector, and a bolt that had been sharpened to a point on one end.[5] Williams testified that he laid out these components in a manner in which they could have been assembled to build a weapon and photographed the assemblage. From the photograph Williams explained to the jury how the components could be assembled into a weapon. The State then showed Williams a plastic replica of the photographed assemblage and asked Williams if the replica accurately depicted the manner in which the components could have been assembled. Williams agreed that the replica was a possible combination of the components he examined, but admitted he did not have all the components and it was possible that additional items were placed on the weapon. Williams also identified a section of the victim's skull he had received from the medical examiner, and demonstrated to the jury how the plastic replica fit into a hole in the skull section.
Harris claims the plastic replica was erroneously admitted as demonstrative evidence because the State failed to establish any information about the weapon. The record does not support Harris's claim. Harris told Palmer the white bag he wanted her to dispose of contained a gun he had made by welding pieces together. There was expert testimony identifying the recovered components and explaining how the components could have been assembled to build a weapon. There was also expert testimony linking the weapon to the hole in the victim's skull. As we explained in Alston v. Shiver, 105 So.2d 785, 791 (Fla.1958):
Demonstrative evidence is admissible only when it is relevant to the issues in the case. Such evidence is generally more effective than a description given by a witness, for it enables the jury, or the court, to see and thereby better understand the question or issue involved. For this reason it is essential, in every case where demonstrative evidence is offered, that the object or thing offered for the jury to see be first shown to be the object in issue and that it is in substantially the same condition as at the pertinent time, or that it is such a reasonably exact reproduction or replica of the object involved that when viewed by the jury it causes them to see substantially the same object as the original.
The person offering such evidence should be required to give a good reason for its acceptance into evidence, and this is particularly true if the object be not the original, but only a replica or a facsimile.
The trial court did not abuse its discretion in allowing the State to display the plastic replica because it met the requirements as outlined in Alston. See, e.g., Heath v. State, 648 So.2d 660, 664 (Fla.1994) (stating that rulings on evidentiary matters generally are within the sound discretion of the trial court).
The jury had previously seen the components laid out and assembled in Williams' photograph; the replica was simply a *864 physical representation of the assembled components to enable the jury to better understand the weapon. Moreover, the trial court instructed the jury on the replica and its display was relatively short.[6] The replica was the same size as the component exhibits and was a reasonably exact reproduction of the assembled weapon in Williams' photograph. See Brown v. State, 550 So.2d 527, 528 (Fla. 1st DCA 1989) ("The demonstrative exhibits which the state used during the victim's testimony... in order to depict the knife before it was broken and the extent of the victim's stab wounds, were sufficiently accurate replicas to be allowable within the trial court's discretion."); Wade v. State, 204 So.2d 235, 238-39 (Fla. 2d DCA 1967) (finding that trial court did not err by admitting demonstrative evidence when it was relevant to the issues in the case and when it was a reasonably exact replica of the object involved); Robinson v. State, 145 So.2d 561, 562 (Fla. 3d DCA 1962) (concluding that scale model of the death weapon did not mislead or confuse the jury and was appropriately identified by the state's expert witness). Finally, the probative value of the replica outweighed any prejudicial effect because the replica was used to explain the manner in which the components could have been combined to build a weapon and the manner in which the weapon was consistent with the victim's head injury. See § 90.403, Fla. Stat. (2000).

Admission of Inflammatory Photographs and Videotape
Harris argues as his final guilt phase issue that the trial court erred in admitting irrelevant inflammatory photographs of the murder victim and a videotape of the crime scene.
We have consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield v. State, 758 So.2d 636 (Fla.2000). Photographs are admissible if "they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted." Bush v. State, 461 So.2d 936, 939 (Fla.1985). Moreover, photographs are admissible "to show the manner of death, location of wounds, and the identity of the victim." Larkins v. State, 655 So.2d 95, 98 (Fla.1995). On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury. However, a trial court's decision to admit photographic evidence will not be disturbed absent an abuse of discretion. See Mansfield, 758 So.2d at 648.
Brooks v. State, 787 So.2d 765, 781 (Fla. 2001). The mere fact that photographs may be gruesome does not necessarily mean they are inadmissible. The admission of such photographs is within the trial court's discretion and will only be reversed when an abuse of discretion has been demonstrated. See Rose v. State, 787 So.2d 786 (Fla.2001), cert. denied, 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 252 (2002).
In this case, the State introduced several photographs of the victim's body as well as a short videotape of the van where the body was discovered. Harris objects to this evidence as inflammatory.

*865 Photographs 2 and 6

The medical examiner, Dr. Floro, identified State's exhibits 2 and 6 as photographs of the victim's head and skull. The defense objected to photographs 2 and 6 because maggots are visible in both photographs. The trial court overruled the objection, finding the photographs necessary to show the cause and manner of death. Dr. Floro testified that the victim had a wound to the back of the head. Dr. Floro then used photograph 2 to explain the external nature of the wound, describing the shape and size of the wound, and photograph 6 to describe the path of the object that entered the victim's head. We find both photographs relevant to Dr. Floro's expert testimony as to the cause of death and therefore admissible. See Rose v. State, 787 So.2d 786, 794-95 (Fla.2001) (finding that autopsy photos, even when difficult to view, are admissible to the extent they fairly and accurately establish a material fact and are not unduly prejudicial); Larkins v. State, 655 So.2d 95 (Fla. 1995); Bush v. State, 461 So.2d 936 (Fla. 1984).

The videotape and photographs 63, 64, 65, and 68
The videotape is approximately eight minutes long and was shot from outside the van in the truck stop parking lot. Defense counsel objected to the admission of the videotape, arguing that it was gruesome and that its prejudicial impact outweighed its probative value. The prosecutor noted the most gruesome portions of the videotape had been redacted, and argued that the videotape showed the position of the victim inside the van and the victim's clothes, both important to the jury's understanding of how the murder occurred. The trial judge cleared the courtroom, viewed the videotape, and then allowed the videotape to be shown to the jury. Photographs 63, 64, and 65 show the victim's body inside the van from three different points of view, while 68 is a view of the cargo area of the van. In both the videotape and the photographs, the victim's body is seen in a state of decomposition. However, we find both the videotape and the photographs relevant to establish the manner in which the murder was committed and to assist the deputy sheriff who described the crime scene to the jury. See Pope v. State, 679 So.2d 710, 713-14 (Fla. 1996) (finding that photos of the bloody bathroom where the stabbing occurred and the victim's bloody clothes were relevant to establish the manner in which the murder was committed and to assist the crime scene technician in explaining the condition of the crime scene when the police arrived). Because the videotape and photographs were relevant to issues being considered by the jury, the trial court did not abuse its discretion in admitting these items of evidence.

Photograph 103
Photograph 103 documents the victim's skull with the murder weapon inserted into the hole in the skull. Williams, the firearms and tool mark identification expert, used the photograph to explain that the reconstructed weapon fit the hole in the skull. Defense counsel objected to photograph 103 as cumulative. We find this photograph relevant to understanding the way the weapon caused the wound in the victim's skull. See Larkins, 655 So.2d at 98. "Relevant evidence which is not so shocking as to outweigh its probative value is admissible." Pope, 679 So.2d at 714. Accordingly, we find the trial court did not abuse its discretion in admitting the photographs and videotape. See Gorby v. State, 630 So.2d 544, 547 (Fla.1993) (finding that trial court did not abuse its discretion in admitting numerous photographs as well as a videotape of the crime scene where *866 the trial court conscientiously considered all of the photos and rejected those it found to be too prejudicial or cumulative).

PENALTY PHASE

Pecuniary Gain Aggravator
Harris claims the trial court erred in instructing the jury that the murder was committed for pecuniary gain and in finding that the murder was committed for pecuniary gain. We agree. In order to establish the aggravating factor of pecuniary gain, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain. See Rogers v. State, 783 So.2d 980, 993 (Fla.2001); Finney v. State, 660 So.2d 674, 680 (Fla.1995); Clark v. State, 609 So.2d 513, 515 (Fla.1992). In reviewing aggravating factors, it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. See Willacy v. State, 696 So.2d 693, 695 (Fla.1997). Rather, this Court's task on appeal is to review the record to determine whether the trial court applied the correct rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding. See id.
After a review of the record, we conclude the pecuniary gain aggravator is not supported by competent, substantial evidence in this case. To support this aggravating factor, the trial court found that Harris was trying to transfer property owned jointly to his name alone, that he was the beneficiary of life insurance policies on his wife, that he emptied his wife's checking account four days after the murder, that the contents of the wife's purse had been dumped on the floor of the van, and that Harris did not want to pay child support. The five factors relied on by the trial court to support the pecuniary gain aggravator are purely circumstantial, and although an aggravating factor may be supported entirely by circumstantial evidence, "the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor." Hildwin v. State, 727 So.2d 193, 194 (Fla.1998).
These pieces of circumstantial evidence, however, are not inconsistent with a reasonable hypothesis that negates the aggravating factor. For example, the fact that the defendant was the beneficiary of his wife's life insurance policy is not suspect in and of itself. Any number of husbands and wives name each other as beneficiaries on their life insurance policies. Additionally, the fact that the contents of the wife's purse was dumped on the floor of the van would fit into a theory that someone else killed and robbed the victim. Moreover, there was evidence that money ($20) was among the contents of the purse. But most importantly, there is absolutely no evidence to support the trial court's conclusion that the defendant did not want to pay child support.
The State's theory of the case, and a majority of Palmer's testimony, centered around the fact that Harris wanted to divorce his wife to be with Palmer, but because Harris's wife threatened to take the children if Harris sought a divorce, Harris decided to kill her instead. The record supports this as the motive for the murder and simply does not support the pecuniary gain as a motive for this murder. It cannot be said that the facts relied on demonstrate beyond a reasonable doubt that the murder was motivated, even in part, by pecuniary gain. The trial court relied on the fact that Harris was the beneficiary of his wife's life insurance policies, yet the *867 State failed to produce documentation for any policies in effect at the time of the victim's death. The trial court also found that Harris did not want a divorce because his wife would gain custody of the children and he would have to pay child support. Again, the State presented no evidence to show that potential child support payments played a role in Harris's decision to kill his wife.
The instant case is unlike Walker v. State, 707 So.2d 300 (Fla.1997), where the defendant confessed he and the victim were arguing about a child support award before he killed her. In Walker, we found the pecuniary gain aggravator established beyond a reasonable doubt because the defendant's pecuniary motive of avoiding child support permeated the case. Id. at 317; see also Thomas v. State, 693 So.2d 951 (Fla.1997) (upholding the pecuniary gain aggravator where the defendant planned the kidnapping and murder of his wife to avoid paying his part of a settlement agreement in their pending divorce). Here, the theme that permeated the case is that the defendant wanted to marry Palmer but did not want to lose custody of his children. Accordingly, we conclude the trial court erred in instructing the jury that the murder was committed for pecuniary gain and in finding and weighing the pecuniary gain aggravator.

Cold, Calculated, and Premeditated Aggravator
Next, Harris claims the trial court erred in concluding the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP). In order to establish the CCP aggravator, the evidence must show:
[T]hat the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). We find competent, substantial evidence in the record to support the trial court's finding of this aggravator.
Harris argues the trial court erred in finding the CCP aggravator because the murder was not cold and calculated. Harris claims he "exploded" one night because of his obsession with the potential loss of his children and because he was in love with another woman and wanted out of his loveless marriage. "[T]he `cold' element generally has been found wanting only for `heated' murders of passion, in which the loss of emotional control is evident from the facts...." Walls v. State, 641 So.2d 381, 387-88 (Fla.1994). Contrary to Harris's claim, the record shows that Harris's actions with respect to his wife's murder were calm and deliberate. There was no evidence of a domestic dispute, and no evidence that Harris lost control in a "heated murder of passion." The victim was shot once in the back of the head, "which is by its very nature cold," and there was no evidence of resistance or provocation on the victim's part. Fennie v. State, 648 So.2d 95, 99 (Fla.1994) (upholding cold prong of CCP where victim was shot in the back of the head).
Furthermore, the events leading to Donna Harris's murder support the elements of a calculated plan and heightened premeditation. The evidence showed that Harris planned his wife's murder for a period of weeks. For example, Harris constructed a weapon, asked Palmer to time herself on a route similar to that used *868 on the night of the murder, chose the time and place of the murder, planned where to leave the van after the murder, and planned how to dispose of the evidence with Palmer's help.
Lastly, Harris argues his fear of losing his children was a pretense of moral or legal justification. Supplementing this fear, Harris argues, is the fact that he did not see his daughter from a previous marriage for three years after the couple separated. Harris's fears do not demonstrate a pretense of moral or legal justification. As the trial court logically stated in its sentencing order:
The Defendant's stated reason of not wanting to lose his children is highly suspect in light of the testimony regarding his multiple plans to kill his wife so that he could be with his girlfriend. If the Defendant had had any real concern for his children, he would have considered the impact that losing their mother at such young ages would have on them. The only concern of the Defendant that has been demonstrated by the record in this case is his concern for himself and his personal desires.
In other words, the trial court found that Harris's claim of fear of losing his children did not negate the cold and calculated nature of this murder. See Banda v. State, 536 So.2d 221, 225 (Fla.1988) (defining a pretense of moral or legal justification as any "claim of justification or excuse that, though insufficient to reduce the degree of homicide, nevertheless rebuts the otherwise cold and calculating nature of the homicide").
Because there is competent, substantial evidence in the record supporting the finding that the murder was cold, calculated, and premeditated without any pretense of moral or legal justification, we find the trial court did not err in finding the CCP aggravator.

Trial Court's Treatment of Mitigating Evidence
Harris also challenges the trial court's treatment of the mitigation in this case. We find no merit in the arguments concerning the weight the trial court gave to the statutory mitigator of lack of significant history of criminal activity. The weight assigned to a mitigating circumstance is within the trial court's discretion, and Harris has failed to demonstrate an abuse of that discretion. See Rogers v. State, 783 So.2d 980 (Fla.2001). Likewise, we find no error in the trial court's failure to find separate mitigating circumstances based on Harris's alleged family conflict and his ability to form loving relationships because these factors were used to support other mitigators that were found and considered.
We do, however, find merit in Harris's argument that the trial court failed to consider all of the evidence presented in support of the mitigating circumstance of extreme mental or emotional disturbance. In its discussion of this mitigator in the sentencing order, the trial court noted that Harris was deemed unfit for continued military service in the United State Air Force based on a diagnosis of anxiety disorder and depression, that Harris's mother testified she and her father have unstable mental histories, and that she suffers from anxiety attacks and panic disorder. It is well settled that the decision as to whether a mitigating circumstance has been established is within the trial court's discretion. See, e.g., Foster v. State, 679 So.2d 747, 755 (Fla.1996). However, the trial court must consider all of the evidence presented in support of the mitigator. See Provenzano v. State, 497 So.2d 1177, 1184 (Fla.1986).
In this case the trial court did not consider all of the evidence presented in *869 support of the statutory mitigator of extreme mental or emotional disturbance because the sentencing order failed to address any of the evidence presented at the Spencer hearing. At this hearing, Harris presented uncontroverted evidence that he had a familial pattern of mental illness, that he had suffered a traumatic head injury as a teenager, and that he had symptoms of possible manic depression with mood swings in 1995. He also presented evidence that he was diagnosed with bipolar II disorder and was prescribed Depakote in 1996, and that sixty days before his wife's death, he had a psychiatric consultation. The trial court erred in failing to consider this additional mental health evidence in making its determination concerning the extreme mental or emotional disturbance mitigator. As we said in Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990):
[T]he sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature.... The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance. Although the relative weight given each mitigating factor is within the province of the sentencing court, a mitigating factor once found cannot be dismissed as having no weight. To be sustained, the trial court's final decision in the weighing process must be supported by "sufficient competent evidence in the record."
See also Reese v. State, 694 So.2d 678 (Fla.1997). Moreover, as Harris correctly argues, the trial court should have, at the very least, evaluated this evidence in the context of a nonstatutory mental mitigator. See Stewart v. State, 620 So.2d 177 (Fla. 1993).
As has been discussed above, the trial court in this case erred in instructing the jury that it could consider the pecuniary gain aggravating factor and in finding that the pecuniary gain aggravator was proven beyond a reasonable doubt. The only valid aggravator remaining is that the murder was cold, calculated, and premeditated. In addition to finding an aggravating circumstance that was not proven beyond a reasonable doubt, the trial court failed to evaluate all of the evidence submitted by the defendant in support of his claim that the murder was committed while he was under extreme mental or emotional disturbance. Under the circumstances of this case, it cannot be said that these errors had no effect on the jury's recommendation of death or on the trial court's sentencing decision. The jury recommended death by the narrowest of margins, seven to five. Only one more vote was needed for a life recommendation. The scales might have been tipped in favor of life had the jury not been instructed on the aggravating circumstance of pecuniary gain. Thus, it cannot be said that the jury's consideration of the pecuniary gain aggravator was harmless beyond a reasonable doubt.
Additionally, when a trial court erroneously includes in its sentencing evaluation an aggravating circumstance that has not been proven beyond a reasonable doubt and fails to consider and properly evaluate mitigating evidence, this Court is deprived of the tools to meaningfully review the sentence imposed or to undertake a proportionality review. See, e.g., Woodel v. State, 804 So.2d 316, 327 (Fla.2001) (vacating the sentence of death and remanding because the trial court failed to evaluate the mitigating circumstances in the sentencing *870 order); Ford v. State, 802 So.2d 1121, 1134-35 (Fla.2001) (outlining the trial court's obligation to evaluate mitigating evidence), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002). Because we cannot say that the consideration by the jury and the trial judge of this aggravating factor was harmless beyond a reasonable doubt, we reverse the sentence imposed in this case and remand for a new penalty phase proceeding. See Crook v. State, 813 So.2d 68 (Fla.2002); Rhodes v. State, 547 So.2d 1201 (Fla.1989).
Because the defendant is entitled to a new penalty phase proceeding, we do not address Harris's remaining penalty phase issues.

CONCLUSION
Based on the foregoing, we affirm Harris's conviction for first-degree murder. However, we vacate his sentence of death and remand this case to the trial court for a new penalty phase proceeding.
It is so ordered.
ANSTEAD, C.J., PARIENTE, LEWIS, and QUINCE, JJ., and SHAW and HARDING, Senior Justices, concur.
PARIENTE, J., concurs with an opinion.
WELLS, J., concurs in part and dissents in part with an opinion.
PARIENTE, J., concurring.
I concur in the majority's decision to reverse and remand for a new penalty phase. I agree that the error in instructing the jury on a pecuniary gain aggravator that is unsupported by the evidence cannot be deemed harmless as to either the advisory sentence or the imposition of the death penalty. The jury was instructed on only two aggravators and this Court has now determined that there was insufficient evidence to support the pecuniary gain aggravator. In light of the seven-to-five advisory sentence of death, the existence of only one valid remaining aggravating factor, and the lack of any significant prior criminal history, it cannot be stated that any error in submitting the pecuniary gain aggravator to the jury for its consideration was harmless beyond a reasonable doubt. Just as we cannot state beyond a reasonable doubt that the trial judge would have imposed a sentence of death without the invalid aggravator, we cannot state beyond a reasonable doubt that the jury would have recommended the death penalty without consideration of the pecuniary gain aggravator.
Any harmless error analysis as to the possible effect on the jury's recommendation is even more critical in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in which the United States Supreme Court stated that it is the jury as trier of fact that must find the existence of any aggravating circumstance that qualifies the defendant for the death penalty. The seven-to-five death recommendation by a jury instructed on one valid and one invalid aggravating circumstance makes it entirely possible that Harris was sentenced to death without a majority of his jury finding that one valid aggravating circumstance existed.
Finally, even if we were not reversing because of the pecuniary gain aggravator, in my view the death recommendation in this case by a bare majority of the jurors raises constitutional concerns in light of Ring. See generally Bottoson v. Moore, 833 So.2d 693, 709-710 (Fla.2002) (Anstead, C.J., concurring in result only); id. at 717 (Shaw, J., concurring in result only); id. at 722 (Pariente, J., concurring in result only).
*871 WELLS, J., concurring in part and dissenting in part.
I concur in affirming the conviction of guilt. I dissent from reversing the sentence. Any error on the part of the trial judge in respect to pecuniary gain is harmless beyond a reasonable doubt. See Green v. State, 641 So.2d 391 (Fla.1994).
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] (1) The capital felony was committed for pecuniary gain (moderate weight); and (2) the murder was cold, calculated and premeditated, without any pretense of legal or moral justification (substantial weight). The trial court considered a third aggravator, the murder was committed during the unlawful discharge of a destructive device, but found that this factor did not exist.
[3] (1) No significant history of prior criminal activity (given moderate weight); (2) extreme mental or emotional disturbance (found not to exist); and (3) extreme duress or the substantial domination of another person (found not to exist).
[4] (1) Harris was a loving son to his mother (given very little weight); (2) Harris was a loving brother to his sister (given very little weight); (3) Harris provided financial and emotional assistance to his sister (given little weight); (4) Harris acted as a surrogate father for his niece (given little weight); (5) Harris did good deeds for others (given very little weight); (6) Harris's work record (given little weight); (7) Harris's ability to work under supervision and adverse conditions (given little weight); (8) Harris's ability to form caring and loving relationships (given no weight); (9) Harris exhibited appropriate cordial behavior at trial (given little weight); (10) Harris was a loving father (the court found this was not a mitigating factor and did not consider it as such); (11) Harris did not flee after the crime (the court found this was not a mitigating factor and did not consider it as such); (12) Harris had a sweet and loving character (the court found this was not a mitigating factor and did not consider it as such); (13) Harris was a good material provider for his family (given little weight); (14) history of conflict within the family (the court found this mitigating factor did not exist and did not consider it as such); (15) Harris's military record (given little weight); and (16) Harris was decorated during his military service (given little weight).
[5] This evidence was retrieved, with Palmer's assistance, from various locations in Columbia County.
[6] The trial court's instruction on the plastic replica is as follows:

Members of the jury, an item is about to be shown to you. It is not evidence in this case. It should not be considered as evidence. It is merely a demonstrative aid which you can consider in weighing and evaluating the positive and direct evidence which you have received. You may display the aid.